[Crim. No. 25207. July 28, 1988.]

In re ANTONIO CORDERO, JR., on Habeas Corpus.

**COUNSEL**

Ephraim Margolin, under appointment by the Supreme Court, and Sandra Coliver for Petitioner.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Donald E. De Nicola, Mark Alan Hart, Gary H. Hahn and Robert F. Katz, Deputy Attorneys General, for Respondent.

**OPINION**

**MOSK, J.**—Petitioner Antonio Cordero, Jr., was convicted of murder in the first degree (Pen. Code, § 187) with the use of a firearm (*id.*, §§ 12022.5, 1203.06, subd. (a)(1)(i)). He was sentenced to a term of 25 years to life for the murder; imposition of the firearm enhancement was stayed pending completion of the murder sentence.

Petitioner now seeks habeas corpus on allegations of ineffective assistance of counsel. We appointed the Honorable Harry T. Shafer, Judge of the Los Angeles Superior Court, retired, as referee to receive evidence and make findings of fact and conclusions of law. After conducting an evidentiary hearing, Judge Shafer concluded that petitioner's trial counsel had per-

formed deficiently in several respects, that counsel's deficiencies had prejudiced petitioner's defense, and that petitioner accordingly received ineffective assistance of counsel.

As we shall explain, we adopt the referee's determination that petitioner received ineffective assistance of counsel. Accordingly, we reverse the judgment of the Court of Appeal with directions to grant the petition for habeas corpus.

## I. *The Facts*

At approximately 2 a.m. on April 17, 1982, petitioner was pumping gas into his car at a service station on the corner of Artesia Boulevard and Western Avenue in the City of Torrance. Petitioner's younger brother, Joe, and two of his friends, Vincent Acosta and Ronald Rodriguez, were inside a store on the premises. A truck drove into the station and parked at the island of gasoline pumps parallel to those where petitioner stood. The truck was driven by Marceal Barajas; his wife, Sally, sat beside him in the cab, while several relatives and friends sat in the truck bed. Marceal began pumping gas, Sally walked into the store, and the passengers got out to stretch their legs.

Petitioner finished pumping gas and entered the store to join his companions. As the four youths returned to his car, petitioner approached Marceal and asked for directions to Hollywood. After a brief conversation, petitioner walked back to his car and opened its trunk. He then turned, pointed at one of Marceal's young passengers, and called him a "bastard" in Spanish. Marceal replied that the boy was "not one of those." Petitioner continued to swear at the youth.

After an exchange of insults, petitioner called Marceal over to the opened trunk of his car to "see what I got." Marceal walked toward the petitioner despite the warnings of his passengers. Petitioner reached into the trunk, lifted a handgun from a leather case, and shot Marceal once in the chest at point-blank range. He died shortly thereafter.

As petitioner drove away with his companions, a witness noted the license plate of the car. Petitioner was arrested the next day after the police tracked his vehicle. They searched the car and the residence where he was arrested, but found no gun. They did discover one .32-caliber bullet in the trunk of the car; the bullet that was removed from Marceal's chest was of .357 or .38 caliber.

The day after his arrest, petitioner consented to a taped interview with the police. He denied possessing a handgun or shooting the victim, and

claimed he had been standing beside the trunk preparing to put oil in his car, heard a loud noise, and saw a black car, approximately 75 feet from the service station, speed away. He claimed he did not realize at the time that a shooting had occurred. He told the police that he had been "partying . . . all night long" prior to the incident, and had consumed two to three 6-packs of beer. He stated seven times during the course of the interview that he was "high" at the time of the killing.

## II. *The Trial*

Petitioner's trial was held in July 1982, and lasted two days. The People called 11 witnesses, 2 of whom testified that they saw petitioner kill Marceal Barajas. Two others placed him at the scene of the crime and testified that he had argued with the victim prior to the shooting. A medical examiner testified that the victim had been shot at near point-blank range, and a firearms expert testified that the victim had been killed by either a .38- or .357-caliber bullet. The People introduced a transcript of petitioner's taped statement and played the recording in its entirety for the jury.

Arnold Lieman represented petitioner at trial. The Court of Appeal described his conduct of the defense as follows: " 'The public defender representing [petitioner] made no opening statement and introduced no evidence either to support a defense theory or to impeach the prosecution's case. Furthermore, counsel did not probe differences between accounts of various eyewitnesses for the prosecution, and did not object to the admission into evidence of the [petitioner's] tape-recorded statement. [Petitioner] was not called to testify as a witness.' "

In closing argument, the prosecutor urged the jury to return a verdict of murder in the first degree. He reviewed the testimony of the witnesses placing petitioner at the scene and identifying him as the killer, and contrasted their description of the incident with the account offered by petitioner in his statement to the police. He observed that petitioner claimed the shot had been fired from a car 75 feet away, but that the medical examiner testified the victim was killed at point-blank range.

Turning to the petitioner's possible intoxication, the prosecutor noted that "We have heard some evidence from the defendant's statement that at the time of this incident he was under the influence of alcohol. Well, I don't think under the influence is a strong enough word, because in order for what the defendant did to be excused by the use of alcohol, and in order to explain his total lack of memory as to certain things that happened or his denial that things happened, he would have had to have been really stinking drunk, practically unconscious; blind drunk, I think would be a really good

word to use. [¶] . . . . He would have had to have been so drunk, ladies and gentlemen, that he would have been staggering and stumbling all over that gas station, yet nobody indicated that they saw anything at all queer about the way that he was acting."

Lieman argued in closing for a verdict of not guilty or of voluntary manslaughter, based on the theory that petitioner killed in the heat of passion induced by his own intoxication. In support of a manslaughter verdict, Lieman stated that "We know Mr. Cordero, in his statement, had been drinking. He says he was high, feeling the effect. He said he was swerving in the statement he gave to the police, mentioned being high or being under the influence several times. [¶] The law does not require someone to be, in the words of the prosecutor, 'blind drunk.' That is not the law. The law is just, someone has to be so moved by heat of passion—and, of course, heat of passion is a term of art, you know, in the legal word [*sic*], which the judge is going to define to you, the sudden quarrel or heat of passion overcomes one's reasoning, and that is what leaves the reduction of a murder to a manslaughter."

Lieman requested a jury instruction on intoxication and diminished capacity, CALJIC No. 8.41 (1979 rev.), that had been withdrawn one year earlier after the Legislature abolished the diminished capacity defense. (Pen. Code, § 28.) It was refused on that ground. Lieman did not request the surviving instruction on voluntary intoxication and specific intent, CALJIC No. 4.21 (1981 rev.).

Petitioner was convicted of first degree murder. In affirming the conviction on direct appeal, the Court of Appeal determined in an unpublished opinion that Lieman had introduced insufficient evidence to require the trial court to instruct the jury sua sponte on voluntary intoxication. The court observed that "There was no evidence presented as to the period of time over which appellant may have consumed the beer or at what time he stopped drinking. There was no expert testimony on what effect that amount of beer would have on a person such as appellant or on what effect that amount of beer would have on appellant's *actual intent* to kill or even on his ability to form the necessary intent to kill . . . . Therefore, we must conclude that the evidence of intoxication was too insubstantial to require [a sua sponte] instruction relating to specific intent here."

### III. *Habeas Corpus Proceedings*

#### A. *Procedural History*

In January 1985 Cordero's first petition for writ of habeas corpus was filed with the Court of Appeal and consolidated with his then-pending

appeal from the judgment. The petition alleged that Lieman provided ineffective assistance by failing to investigate and present a competent intoxication defense. Petitioner asserted that as a result of his intoxication, he had killed the victim without premeditation, malice, or intent, and thus would likely have obtained a more favorable disposition had Lieman performed competently.

Accompanying the petition were declarations from the petitioner and a number of individuals who had spent time with him on the day of the killing, each of whom declared that he was highly intoxicated from alcohol and phencyclidine (PCP) during the period preceding the incident. The declarants stated that Lieman had made no attempt to seek out their testimony, and petitioner alleged that Lieman performed almost no factual investigation in preparation of his defense.

Petitioner stated in his declaration that he had no recollection of the shooting. He claimed he spent the day with a group of friends drinking "fairly heavily," and that he smoked several marijuana cigarettes laced with PCP. At some point during the day he gave two spare tires to a friend in exchange for a handgun, which he threw in the trunk of his car. He claimed that he "did not think about whether the gun might be loaded; I assumed that it was not." Petitioner stated that he eventually left to go for a drive with his brother and two friends, but got lost. He drove into a service station "to get gas, directions, and beer." After paying for the gasoline, petitioner returned to his car. He declared that "I don't really remember what happened next although I have discussed the incident so often with people that I know that I shot and killed a man." Petitioner asserted that he "blanked out" when the victim approached him, and remembered nothing until "I was back on the freeway, trying to drive straight . . . ."

To establish the effect of PCP ingestion on an individual's capacity to form specific intent or malice aforethought, petitioner submitted the declaration of Dr. Fred Rosenthal, M.D., Ph.D., an expert in the treatment of PCP intoxication. Dr. Rosenthal declared, in pertinent part: "I have read the Petition for Writ of Habeas Corpus and the opening and closing briefs on appeal filed on behalf of Antonio Cordero, the defendant in the instant case, and the Return and the reply brief of the prosecution. I have also reviewed a transcript of the defendant's statement to the police given shortly after the incident. [¶] Based upon my review of these records, it is my expert opinion that the defendant's account of the events surrounding the killing are [sic] consistent with what are known to be the effects of PCP. In particular, ingestion of PCP can cause temporary black-outs and often induces a psychotic state with paranoid features. It can also induce an individual to engage in irrational and self-destructive behavior . . . . [¶]

Moreover, while PCP generally impairs the user's judgment for several hours, it may not significantly affect motor control a relatively short time after ingestion . . . . [T]he consumption of alcohol along with the PCP could have a synergistic effect, so that a user's reaction could be stronger than his or her reaction to the consumption of only one intoxicant."

The Court of Appeal affirmed petitioner's conviction but determined that "appellant's related petition for writ of habeas corpus and supporting affidavits appear to establish a prima facie showing of ineffectiveness of counsel resulting from defense counsel's failure to investigate possibly meritorious defenses." The court issued an order to show cause returnable before the superior court. After conducting a brief hearing, the superior court denied the petition in May 1985.

In July 1985 Cordero filed a second habeas corpus petition with the Court of Appeal, based on substantially the same grounds as his initial petition. The court denied the second petition without opinion. We granted review and ordered the Director of Corrections to show cause before the Court of Appeal. The Court of Appeal declined to conduct an evidentiary hearing and again denied the petition in an unpublished opinion.

The decision of the Court of Appeal relied heavily on a declaration submitted by Lieman in support of the return to Cordero's second petition. When initially contacted in July 1983 regarding petitioner's claims, Lieman stated that he had no clear recollection of the trial nor his reasons for conducting the defense as he did. Twenty months later, after refreshing his recollection with notes in the files of his former employer, the Los Angeles County Public Defender's office, Lieman executed a declaration in support of the return to Cordero's first petition before the superior court. Lieman claimed in this declaration that petitioner never mentioned to him any exculpatory information about his intoxication, and that "in my investigation and preparation of the case, I never was aware of any basis for a viable diminished capacity or unconsciousness defense."

Eight months later, Lieman executed an additional declaration in support of the return to Cordero's second petition before the Court of Appeal. In this final declaration, Lieman claimed for the first time that he had "discussed a possible diminished capacity defense with petitioner" but had rejected the defense because petitioner "was stuck with his statement to the police," and because petitioner had admitted to Lieman that he "knew what he was doing" at the time of the incident.

Petitioner responded with a declaration denying that Lieman had ever discussed a diminished capacity defense with him or had stated that he was

"stuck" with his statement to the police. Petitioner further denied telling Lieman that he had known what he was doing at the time of the killing. He claimed instead that "I did not know what I was doing and I know that I wouldn't have said that I did . . . ." Petitioner also reiterated earlier claims regarding his insubstantial consultation with Lieman prior to trial.

Despite inconsistencies between Lieman's two declarations, both prepared long after he acknowledged possessing little recollection of the events in question, and despite the factual conflicts between Lieman's declarations and those submitted in support of the petition, the Court of Appeal accepted counsel's final account in its entirety. The court concluded that "a diminished capacity defense was unavailable as a practical matter because of petitioner's tape-recorded statement that was patently inconsistent with the testimony of percipient witnesses as to the details of the shooting. In conjunction with other evidence . . . and considering petitioner's own statement to counsel that he knew what he was doing, petitioner himself made a diminished capacity defense unavailing. Clearly, counsel's decision not to pursue further investigation of such a defense under these circumstances may be said not only to be based on proper tactical and strategic reasons but may even reflect the kind of efficient use of time and resources to be expected of a seasoned deputy public defender."

## B. Current Proceedings

On February 20, 1986, we granted review of the Court of Appeal's denial of Cordero's second petition for habeas corpus. To assist us in evaluating petitioner's claims and the factual disputes raised by the contradictory declarations before the Court of Appeal, we appointed Judge Harry T. Shafer as referee to take evidence and make findings and conclusions in response to the questions set forth in the margin.[1]

---

[1] We submitted the following questions to the referee:

"1. What steps did petitioner's trial counsel take to investigate this case?

"2. What evidence did petitioner's trial counsel discover regarding intoxication or diminished capacity?

"3. What evidence or leads contained in investigative interviews with defendant and others were not fully explored by trial counsel?

"4. Did petitioner's trial counsel inadequately represent him (i.e., did counsel fail to act in a manner to be expected of a reasonably competent attorney acting as a diligent advocate) either

"(a) by failing to investigate petitioner's case before trial and seek out witnesses on his behalf?

"(b) by failing to consult with petitioner about his condition on the night of the murder, and to discuss with him the theory of the defense or the advisability of testifying on his own behalf?

"(c) by failing to introduce available exculpatory evidence regarding (1) petitioner's intoxication, induced by alcohol and drugs, on the night of the murder; (2) ownership of

The referee conducted a four-day evidentiary hearing. Counsel for petitioner called 12 witnesses, including petitioner and several of his relatives and friends who were with him on the day of the killing. Trial counsel Lieman, counsel's investigator William Lee, and a criminal defense lawyer-expert were also called to testify. The People called three witnesses, all of whom were with the victim when he was shot by petitioner.

Judge Shafer filed his report with this court. As will appear, only his findings regarding counsel's factual investigation are pertinent to our disposition. Those findings, and the evidence offered in support thereof, are as follows:

1. *What steps did petitioner's trial counsel take to investigate this case?*

The referee found that Lieman conferred with petitioner three times over the course of their entire relationship, for a total of "somewhat over one hour at best." Counsel's first meeting with petitioner occurred late in April 1982, a few days after arraignment. Lieman spent the 25-minute conversation reviewing the transcript of petitioner's statement to the police. Lieman next met with petitioner for 20 minutes in early June, near the time of his pretrial conference. The final discussion with petitioner occurred during trial and lasted approximately 15 minutes.

Petitioner testified that Lieman conducted the first two interviews in the open area of the attorney visiting room at the Los Angeles County jail, rather than in the glass-enclosed booths lining one wall of the room. Petitioner testified that the room was crowded and noisy. He and counsel sat across from one another at a long wooden table, and on both sides sat other

bullets found in petitioner's car trunk; (3) petitioner's actions between the murder and the time of his arrest suggesting lack of consciousness of guilt; (4) inconsistencies in the testimony of eyewitnesses?

"(d) by failing to request a jury instruction regarding an intoxication defense?

"5. If any of the subparts of question 4 is answered in the affirmative, (1) did trial counsel's failure to act deprive petitioner of a potentially meritorious defense (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1]) or (2) is it reasonably probable that in the absence of counsel's failings a determination more favorable to petitioner would have resulted (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144])?"

At the time we issued the foregoing order of reference it was the standard form we had used for many years. (E.g., *People* v. *Ledesma* (1987) 43 Cal.3d 171, 192, fn. 2 [233 Cal.Rptr. 404, 729 P.2d 839]; *In re Hall* (1981) 30 Cal.3d 408, 415-416 [179 Cal.Rptr. 223, 637 P.2d 690].) We have now determined, however, that a referee should be asked only to make findings on disputed factual issues, and not to resolve legal issues arising from those facts. Accordingly, courts ordering a reference in future cases should no longer follow the form used here.

defendants speaking with their attorneys. Petitioner testified that he could hear the other conversations.

Lieman introduced himself as a public defender and began asking petitioner whether he had made various statements to the police. Petitioner claimed that he was instructed to answer the questions "yes" or "no." Lieman read from the transcript of the police interview but did not give petitioner a copy. Counsel's notes of the interview establish that, after asking petitioner about his departure from the service station, he inquired whether petitioner had known what he was doing, and that petitioner replied affirmatively. Petitioner, who earlier declared that counsel had never asked him this question, testified at the reference hearing that he now recalled the conversation and had understood he was being asked whether he was capable of driving at the time. Counsel testified that he inquired no further into the meaning of petitioner's response.[2]

During their second conversation, Lieman apprised petitioner of the prosecution's case and stated that he anticipated a manslaughter verdict; petitioner testified that counsel again reviewed his statement to the police. In their final 15-minute discussion, which took place in a holding cell during trial, Lieman discussed the defense strategy and informed petitioner that the district attorney was actually seeking a first degree murder conviction.

The referee found that "Lieman did not personally interview any of the possible witnesses, although he did have subpoenas issued for some of them, and at the onset of the trial or sometime during the first day he spoke to Joe Cordero, brother of Petitioner, but not in an interview." Counsel entrusted the entire factual inquiry to William Lee, an investigator in the public defender's office. Lieman's two-paragraph investigation request instructed Lee to "contact and interview" Joe Cordero and Vincent Acosta, who were in the car with petitioner at the time of the killing, and to contact petitioner's brother-in-law, Charlie Hinojosa, to verify his ownership of the .32 caliber bullet found in the trunk of petitioner's car. The investigation request made no mention of petitioner's mental condition. Apart from an additional request to serve the three witnesses with subpoenas, the referee found that "no oral or further written instructions were transmitted to the investigator by Lieman."

---

[2] Counsel's notes of the initial interview, in their entirety, read: "Heard guys, heard girls arguing. Little brother sick, so didn't put oil in car. [¶] H.B.D. [had been drinking] at least 'two and a half' 6-packs. [¶] Driven from Orange County, Anaheim, and he stopped to buy more beer. [¶] Leaving gas station. [¶] 'Knew what I was doing.' [¶] Little brother, Joe, phone number 425-7067. Vincent Acosta, brother Michael knows, 630-1750. [¶] Tool box belonged to Charlie Hinojosa, 630-1750."

The referee found that Lee spent a total of eight hours preparing petitioner's case. During this time he placed brief telephone calls to the three individuals identified in Lieman's request, arranged for each to be served with a subpoena, and prepared three half-page investigation reports summarizing his conversations with the witnesses. Investigator Lee testified that he had very little recollection of the substance of the conversations, but that it was his practice to inquire only into those matters clearly specified in the attorney's investigation request. There is no indication in any of the investigation reports that Lee inquired about petitioner's intoxication at the time of the incident.

*2. What evidence did petitioner's trial counsel discover regarding intoxication or diminished capacity?*

The referee found that "Lieman learned from the 30 page statement given by the Petitioner to the police that Petitioner had consumed two to three six-packs of beer earlier in the day and had been 'high.'" The referee also noted that the police report of the incident referred to a cigarette possibly containing PCP that was discovered at the scene of the shooting, and indicated that a witness described three Hispanic males who "looked fried," apparently in reference to petitioner and his companions.

Finally, the referee observed that one of the prosecution's witnesses at the preliminary hearing, Renee Juarez, stated directly to Lieman that petitioner appeared intoxicated at the time of the incident:

"Q. (By Mr. Lieman) When you observed Mr. Cordero walk from the market, did he appear to be sober to you? A. No.

"Q. Did he appear to be under the influence of something? A. Well, he looked like it.

"Q. He looked like he had been drinking? A. Yes."

*3. What evidence or leads contained in investigative interviews with defendant and others were not fully explored by trial counsel?*

The referee found that Lieman failed egregiously to pursue the leads and evidence made available to him. Counsel's only attempt to investigate petitioner's intoxication was to ask petitioner during the initial interview whether he had known what he was doing. The referee found that Lieman viewed petitioner's affirmative reply as "an unalterable fact not worth exploring further." Counsel testified that he made no inquiry into the meaning of petitioner's response, which appears to have been contextually ambigu-

ous.[3] This is particularly significant insofar as Lieman testified that his entire defense rested on petitioner's intoxication: "As I saw it, Judge, I had one defense; that the defendant was intoxicated and high, and he was. I didn't have any witnesses who could testify to that effect. And his own statement was that, if he were drunk, at least he knew what he was doing. That's what I was faced with."

While Lieman testified that he had "tried to find witnesses to support [petitioner's] alibi, that is his alibi in the sense that he had been drinking," but that he "couldn't find any," the record demonstrates that counsel made no attempt to pursue any leads contained in the police report, in the transcript of the preliminary hearing, or in petitioner's statement to the police, all relating to his intoxication at the time of the incident. The referee specifically found that counsel failed to explore leads and evidence suggesting that petitioner ingested PCP as well as alcohol prior to the killing.

Counsel did not attempt to determine whether the PCP-laced cigarette mentioned in the police report belonged to the petitioner. Counsel did not contact the witness identified in the police report who stated that petitioner and his companions "looked fried." Counsel did not pursue the testimony of Renee Juarez, who stated directly to Lieman at the preliminary hearing that petitioner appeared intoxicated at the time of the incident.

Most signficantly, counsel completely ignored the numerous leads in petitioner's taped interview. Counsel did not contact Ronald Rodriguez,

---

[3] At the time that Lieman asked petitioner whether he knew what he was doing, counsel was reviewing with petitioner the taped statement he had given to the police after his arrest. Lieman testified that he read petitioner the transcript, line by line, and then asked him to confirm his recorded responses.

From cursory notes of the interview, it appears that counsel elicited petitioner's statement after reviewing a portion of the transcript dealing with petitioner's departure from the gas station. (See fn. 2, *ante*.) Consistent with this sequence, the transcript indicates that the most significant inquiry into petitioner's intoxication and state of mind during the police interrogation followed a discussion of his departure from the scene and his subsequent activities. The colloquy was recorded as follows:

"Q. What kind of shape were [Joe and Vincent] in compared to what kind of shape you were in? A. I don't know, they were all right. The right state of mind I guess.

"Q. Were you in your right state of mind? A. I was high.

"Q. You driving okay? Did you know you were in your right state, did you feel all right? Did you realize, were you able to know that there was red lights and green lights, keep between the lines? A. Well I was swerving a little bit, but I knew I was . . . .

"Q. Did you know where you were? A. Yeah."

This passage of the transcript lends credence to petitioner's contention that his statement followed questioning regarding "who was with me, and . . . who was driving or something to that effect," and that he understood Lieman to be asking "if I knew that I could drive, and I told him, yes, that I felt I was driving okay." Lieman, though, testified that he concluded from the statement—without further inquiry—that "[petitioner] knew he did the killing and he wasn't under the influence."

though he knew from petitioner's statement that Rodriguez was with him when he killed the victim. The statement also referred to a number of individuals who had been "partying" with petitioner prior to the killing, all of whom were likely to be familiar with his degree of intoxication on the night in question.[4] With the exception of Joe Cordero and Vincent Acosta, counsel made no attempt to arrange for these individuals to be interviewed. Furthermore, Lieman's investigation instructions identifying matters to be pursued with Joe and Vincent made no mention of petitioner's possible intoxication, and the investigator's subsequent reports indicate that he queried neither about it.

While the referee found that neither Joe, age 16, nor Vincent, age 14, were forthcoming when contacted by the investigator, he concluded that Lieman nonetheless should have arranged for a more thorough examination of the "youthful witnesses who he should have known were anxious to be helpful to the Petitioner." Lee contacted the youths only briefly by telephone, and both testified that they were unsure who he was and whether he could be trusted. Lieman spoke with Joe during a break in the trial—counsel's only discussion with a witness during his representation of the petitioner—but simply reviewed with him the account of events contained in Lee's investigation report.[5]

Petitioner's statement also indicated that he spoke with his brother-in-law, Charlie Hinojosa, and his wife, Mary Ellen Cordero, immediately after the incident.[6] Mary Ellen was never contacted, and Lieman did not instruct his investigator to ask Hinojosa about petitioner's intoxication.

---

[4] "Q. Okay, let's go back a little bit in the evening. Prior to you getting to the gas station, about what time did you leave your sister's house on Downey Street in Bellflower that night? . . . . A. It must have been . . . well I left in the afternoon. I went to Anaheim. And we were there all night, I guess till about two.

"Q. Where were you in Anaheim? A. I was over at Rick Vargas's house.

"Q. And who was there? A. It was Rick Vargas, my brother Joe, Vincent, Martin Hernandez, . . . a girl named Alice Uribe, her brother . . . Gregory Uribe, all these people. I was partying. Yes, just partying there all night long."

[5] "Q. When you talked to him, to Joe, did you ask Joe about the drinking at the party before the shooting? A. When I talked to Joe, I used the statement that I had gotten from my investigator as the basis of our conversation. I confirmed this is what you told my investigator. We went over, he said 'yes.'

"Q. You did not go outside of the statement? A. No, I asked him if the statement was correct, if that is what happened. He said 'yes.'

"Q. How long did the conversation last? A. Ten, fifteen minutes."

[6] "Q. Where did you go to when you left the gas station? A. Home.

"Q. Is that on Downey with your sister? A. Right.

" . . . . . . . . . . . . . . . . . . . . .

"Q. What did you do as soon as you arrived there? A. I called my wife.

" . . . . . . . . . . . . . . . . . . . . .

Lieman thus failed to investigate petitioner's intoxication with any of at least nine percipient witnesses named in the statement. At the reference hearing, counsel for petitioner called a number of these individuals, including Martin Hernandez, Richard Vargas, Joe Cordero, Vincent Acosta, Charlie Hinojosa, and Mary Ellen Cordero. Their previously unexplored testimony told the following tale of petitioner's PCP and alcohol intoxication on the day he killed Barajas:

At approximately noon on the day preceding the killing, petitioner went to a park in Anaheim and met a number of his friends, including Martin Hernandez, Vincent Acosta, Ronald Rodriguez, and petitioner's brother, Joe Cordero. The youths were drinking beer. Hernandez took petitioner aside and asked him if he would like to "smoke some joints." Petitioner agreed. The two men smoked two or three marijuana cigarettes, and Hernandez gave petitioner two more "for the road." Hernandez testified that he did not tell him the cigarettes had been dipped in PCP. When petitioner returned with Hernandez to the group in the park, Joe Cordero testified that his brother was "very jumpy, excited," and that "his eyes were wide opened, and he had a weird smell." Joe testified that the smell was "like an ethyl smell, maybe alcohol and spearmint. I don't know, quite strange."

After drinking beer most of the afternoon, the group went to the home of Richard Vargas, a friend of petitioner, who lived near the park. Vargas testified that he and petitioner began discussing certain marital problems petitioner was having with his wife. During the conversation petitioner lit a cigarette with an odor "like alcohol burning, ether and spearmint leaves, or something like that. It wasn't really unpleasant, but it was medicinal, smelled like a medicine or something like that." Vargas asked petitioner what the smell was, and "he told me that it was dust or duster, or something like that." Vargas testified that petitioner smoked two cigarettes and continued to drink beer during the conversation. After Vargas's mother appeared, Vargas asked him "to take it elsewhere."

Petitioner's wife, Mary Ellen Cordero, testified that about 7:30 that evening, petitioner called her from a liquor store in Anaheim. They had previously made plans to spend the evening together. She testified that "he was pretty messed up . . . . He was pretty loaded . . . . I could tell by his voice." She testified that she had talked to him once before after he had used PCP, and that his voice sounded similar. She testified that "I had—even had told him, 'you are dusted aren't you?' I told him over the phone. And

"Q. And what did you guys do after you called your wife? A. We sat down for a while, we talked to my brother-in-law.
"Q. What's your brother-in-law's name? A. Charlie."

he denied it. And I said, 'I know you are, you know.' And I told him, 'don't come over. I don't want to see you.'"

Vargas testified that between 11:30 p.m. and midnight, he walked into his house and found petitioner on the telephone. "I was outside, and I came inside, and Tony was on the telephone, and he was talking to somebody but he was yelling at them, and he was screaming at them, where the hell is Joe, and who the fuck is this, and who the fuck are you, and I want to talk to Joe, and all of this other stuff. I said, 'What is going on?' And a friend of mine, Robert Acosta told me, he is talking, 'Tony, what the hell are you doing? That is my grandfather.' [¶] And I put the connections together that he was asking for Joe Wilson, Jr., and he apparently called over to Mr. Wilson's house, who is an elderly man, and was yelling at him, and he seemed out of control, like crazy."

Vargas testified that he took the telephone away from petitioner, "and he was like, well, fuck you guys, and everything, and just really crazy, and then he started out of the house and left." When asked whether he noticed anything unusual about the way petitioner was walking, Vargas replied, "What I noticed was unusual, his behavior, and his yelling, and his temperament, and he was so wild and everything . . . ."

Joe Cordero testified that between midnight and 12:30 a.m., petitioner returned to the park. Joe testified that petitioner was "very angry, and he was quite high . . . . He was loaded. He was high, very jumpy." Joe claimed that he "could smell PCP on [petitioner], and I knew he was drinking . . . ." Joe testified further that petitioner's "eyes were wide open," that "he just looked angry," that he was "sort of babbling" and "didn't make too much sense." He stated that petitioner "was in his own little world."

Petitioner, Joe Cordero, Vincent Acosta, and Ronald Rodriguez then decided to drive to Hollywood in petitioner's car. Joe testified that his brother refused to allow him to drive, and that petitioner "was speeding, swerving." Acosta testified that he was "driving swervy." The group got lost and drove into a service station for directions. Joe testified that he saw petitioner and the victim exchange words, and saw Marceal approach petitioner. After the shooting, Joe testified that petitioner did "nothing. He stood there. I went to the back. He just stood there." Joe said, "Let's go," and petitioner got into the car. Joe testified that he told petitioner what happened as they drove away, but that "he didn't quite understand." Vincent testified that Joe "told Tony, 'you just shot somebody,'" but that petitioner "replied late. He answered late. He didn't say really nothing."

Petitioner drove to the home of his brother-in-law, Charlie Hinojosa. Hinojosa was awakened by Joe, who told him about the shooting. Hinojosa testified that "I tried talking to Tony but you couldn't understand what he was saying . . . . He just didn't make sense." Mary Ellen testified that petitioner called her at approximately 3:30 a.m., apparently from Hinojosa's home, and that they argued for approximately 90 minutes. She testified that he sounded more coherent than he had during their conversation the previous evening, but that "he still sounded like he was, you know, a little buzzed . . . . Like he had been drinking or, you know, drugs or something. His voice still sounded, it wasn't . . . normal . . . ."

Petitioner left to drive Vincent and Ronald to their homes. Hinojosa testified that petitioner was not in a condition to drive, and that "I tried to stop him, but he got angry, so I just let him." On the basis of petitioner's behavior at his home, Hinojosa concluded that he "was more than drunk . . . . He was like he was on something else, on drugs."

4(a). *Did petitioner's trial counsel inadequately represent him (i.e., did counsel fail to act in a manner to be expected of a reasonably competent attorney acting as a diligent advocate) by failing to investigate petitioner's case before trial and seek out witnesses on his behalf?*

The referee answered this question in the affirmative, finding that Lieman "failed to investigate Petitioner's case aside from a placebo effort engaged in by investigator Lee." The record indicates that Lieman did virtually nothing to find witnesses capable of corroborating petitioner's intoxication on the night of the killing. He failed to pursue almost all potential witnesses and leads mentioned in the police report, the transcript of petitioner's post-arrest statement, and the testimony offered at his preliminary hearing. As a result, Lieman acquired no information regarding petitioner's possible ingestion of PCP preceding the killing, and failed to obtain any evidence corroborating his alcohol intoxication.

The three witnesses whom counsel arranged for Lee to interview were contacted only briefly by telephone and were not asked about petitioner's mental state. This is particularly significant in light of Lieman's conceded reliance on petitioner's intoxication as the sole theory of his defense. The referee concluded that counsel, who testified to a caseload of 40 to 50 felonies during his defense of the petitioner, "labored minusculely and a catastrophe resulted."

4(b). *Did petitioner's trial counsel inadequately represent him by failing to consult with petitioner about his condition on the night of the murder?*

The referee answered this question in the affirmative. Lieman's only attempt to consult with petitioner about his condition on the night of the incident was to inquire, during the initial interview, whether he had known what he was doing. As discussed above, the referee found that Lieman viewed petitioner's affirmative response as "an unalterable fact not worth exploring further," despite its apparent contextual ambiguity.

Consistent with this lack of inquiry, Lieman failed to acquire the basic information necessary to evaluate and present a competent alcohol intoxication defense. Although he claimed to know that the effect of alcohol is critically dependent on whether an individual eats prior to drinking, as well as on the period of time over which the individual ingests the intoxicant, he admitted no attempt to elicit either of these facts from petitioner.[7]

5. *If any of the subparts of question 4 is answered in the affirmative, (1) did trial counsel's failure to act deprive petitioner of a potentially meritorious defense or (2) is it reasonably probable that in the absence of counsel's failings a determination more favorable to petitioner would have resulted?*

The referee concluded that "For all of the reasons articulated [in the reference report], the deprivation by Lieman of a meritorious defense available to his client marred the proceedings and it is further probable that in the absence of Lieman's failings in this matter, a determination more favorable to the Petitioner would have ensued."

IV. *Contentions*

A. *The Law*

In *People* v. *Ledesma* (1987) 43 Cal.3d 171, 215-218 [233 Cal.Rptr. 404, 729 P.2d 839] (hereafter *Ledesma*), we recently summarized the legal principles governing claims of ineffective assistance of counsel. ■ We

---

[7]"Q. Now, assuming then that the number of drinks the defendant consumes may be quite crucial to the defense you decided to go with, wouldn't that follow that to present your defense appropriately, you will have to have first the basic knowledge of when were the drinks consumed; was there anything in the stomach or was the stomach empty at the time; how were the events spaced in time; how long before the shooting and things of that nature? A. That is correct.
"Q. Was an investigation of that sort ever carried out? A. No."

observed that a defendant's right to assistance of counsel, guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, "entitles the defendant not to some bare assistance but rather to *effective* assistance. Specifically, it entitles him to 'the reasonably competent assistance of an attorney acting as his diligent conscientious advocate.' " (*Id.* at p. 215, quoting *United States* v. *DeCoster* (D.C.Cir. 1973) 487 F.2d 1197, 1202 [487 F.2d 1197], italics in original, citations omitted.) This right requires that "before counsel undertakes to act at all he will make a rational and informed decision on strategy and tactics founded on adequate investigation and preparation." (*Ledesma,* at p. 215.)

■ To establish that counsel's assistance was sufficiently ineffective to justify the issuance of a writ of habeas corpus, petitioner must first demonstrate that counsel's performance " 'fell below an objective standard of reasonableness . . . under prevailing professional norms.' " (*Ledesma,* at p. 216, quoting *Strickland* v. *Washington* (1984) 466 U.S. 668, 688 [80 L.Ed.2d 674, 693-694, 104 S.Ct. 2052].) ■ This determination generally must be made with deference to avoid the dual pitfalls of second-guessing counsel's tactics and chilling vigorous advocacy by tempting counsel "to defend himself against a claim of ineffective assistance after trial rather than to defend his client against criminal charges at trial . . . ." (*Ledesma,* at p. 216.) However, "deferential scrutiny of counsel's performance is limited in extent and indeed in certain cases may be altogether unjustified. '[D]eference is not abdication' [citation]; it must never be used to insulate counsel's performance from meaningful scrutiny and thereby automatically validate challenged acts or omissions." (*Id.* at p. 217.)

■ Petitioner must also demonstrate that counsel's deficient performance prejudiced his defense. Prejudice generally requires an affirmative showing that, absent counsel's errors, there is a reasonable probability of a more favorable outcome. (*Ledesma,* at p. 218.) A "reasonable probability" is not a showing that "counsel's conduct more likely than not altered the outcome in the case," but simply "a probability sufficient to undermine confidence in the outcome." (*Strickland* v. *Washington, supra,* 466 U.S. at pp. 693-694 [80 L.Ed.2d at pp. 697-698].)

### B. *Discussion*

The referee determined that counsel performed deficiently in a variety of respects, and in so doing prejudiced petitioner's defense. The Attorney General contends this determination is erroneous. In considering his objections, our standard of review is settled. ■ The referee's conclusions of law, as well as his resolution of mixed questions of law and fact, are subject

to independent review. (*Ledesma,* at p. 219.) Mixed questions "include the ultimate issue, whether assistance was ineffective, and its components, whether counsel's performance was inadequate and whether such inadequacy prejudiced the defense." (*Ibid.*) The referee's findings of fact are not binding on the court, but are entitled to great weight when supported by substantial evidence. This deference derives from the fact that the referee benefits from the opportunity to observe the demeanor of witnesses and to consider their statements in light of their manner on the stand. (*Ibid.*)

We turn to the objections raised by the Attorney General respecting the adequacy of counsel's factual investigation.

### Counsel's Factual Investigation: Competency

 We observed in *People* v. *Frierson* (1979) 25 Cal.3d 142, 164 [158 Cal.Rptr. 281, 599 P.2d 587], that "where diminished capacity appears to be the *sole* potentially meritorious defense, and counsel has in fact elected to present such a defense at trial, counsel must be expected to take those reasonable measures to investigate the factual framework underlying the defense preliminary to the exercise of an informed choice among the available tactical options, if any." (Italics in original.) Even if counsel has legitimate tactical reasons for introducing no evidence, his performance is still inadequate if evidence supporting a potentially meritorious defense remains unexplored. (*People* v. *Mozingo* (1983) 34 Cal.3d 926, 934 [196 Cal.Rptr. 212, 671 P.2d 363].)[8] The Attorney General argues that the referee erred in concluding that Lieman failed to conduct such a reasonable factual investigation of petitioner's potential defense of intoxication.

1.

The Attorney General first claims that the referee erred in determining that Lieman should have investigated the reference made in the police report to a PCP-laced cigarette found at the scene of the crime. He asserts that the discussion of the item in the report indicates that it was found on or near the victim's body, and thus apparently belonged to Marceal, not petitioner. This argument discounts the report's ambiguity with respect to

---

[8] The Attorney General asserts that counsel attempted an "alcohol-aided anger and passion" defense rather than an intoxication defense, contrary to Lieman's testimony at the reference hearing. However, the issue is irrelevant to the competency of his factual investigation. Regardless of the defense ultimately proffered, counsel was obliged to reasonably investigate the evidence supporting each potentially meritorious defense before making a tactical choice among them. (*People* v. *Frierson, supra,* 25 Cal.3d at pp. 162-163.) Intoxication, whether or not it constituted Lieman's defense theory, plainly was of potential merit and deserved investigatory attention.

whether the cigarette was found on the body of the victim or simply near-by,[9] and ignores the fact that petitioner shot the victim at point-blank range after the victim had walked to the trunk of petitioner's car. Given the possible significance of the evidence to Lieman's intended intoxication defense, counsel plainly should have inquired into its ownership.[10] This conclusion is all the more compelling when we consider that the police report also identified a witness at the service station who stated that petitioner and his companions "looked fried." The Attorney General says nothing about Lieman's failure to investigate this witness's potential testimony. We conclude that the record supports the referee's determination that counsel performed inadequately by failing to investigate leads and evidence contained in the police report.

2.

The Attorney General asserts that the referee erred in determining that Lieman inadequately conferred with petitioner about his condition on the night of the killing. He stresses that petitioner told counsel he had known what he was doing, and argues that petitioner thereby acknowledged his conscious and malicious commission of murder. The Attorney General also points to Lieman's testimony that petitioner denied having ingested any intoxicant other than alcohol. Finally, he emphasizes that petitioner made no attempt to come forward and volunteer to counsel his ingestion of PCP. The Attorney General argues these statements and actions relieved Lieman of any obligation to further pursue the issue with petitioner.[11]

The foregoing theory would permit an attorney to relinquish without further inquiry any defense that is inconsistent with a statement of his client. ▪ But while a client's comments certainly bear on the appropriate scope and focus of counsel's factual investigation (*Strickland* v. *Washington, supra,* 466 U.S. at p. 691 [80 L.Ed.2d at pp. 695-696]), they cannot determine counsel's investigative responsibilities in every case. ▪ When, as here, the inconsistent statement was made to a virtual stranger by

[9] The police report reads: "[The investigating officer] recovered various articles of clothing and personal items of the victim. Items included, one vest . . . one intravenous needle, and 40 cents in change. [The investigating officer] also recovered a cigarette which contained possible PCP."

[10] The victim's wife testified that her husband did not smoke PCP.

[11] It is notable that the Attorney General's objection to this determination focuses solely on Lieman's failure to elicit information regarding petitioner's PCP ingestion. The Attorney General ignores counsel's admitted failure to inquire into the details of petitioner's alcohol intoxication, of which he was certainly aware. It is beyond dispute that counsel's presentation of his alcohol intoxication defense was made without the benefit of " 'substantial factual inquiry* into the specifics of petitioner's mental condition . . . .' " (*People* v. *Frierson, supra,* 25 Cal.3d at p. 162, quoting *In re Saunders* (1970) 2 Cal.3d 1033, 1048 [88 Cal.Rptr. 633, 472 P.2d 921], italics in original.)

a young defendant during the course of a 25-minute initial interview, and cut to the heart of counsel's sole anticipated defense, it offends reason to suggest that the comment justified counsel in surrendering the cause without further inquiry. This is particularly true in light of the fact that the statement itself was a description of petitioner's mental condition after the ingestion of at least two to three 6-packs of beer, an admitted event that would presumably render his recollection significantly less than acute.

In addition to its untenable conception of counsel's investigative responsibilities, the Attorney General's argument rests on facts and inferences hotly contested by petitioner and evidently rejected by the referee. We thus consider whether the referee's favorable assessment of petitioner's conflicting testimony is supported by credible evidence. The record shows that petitioner flatly denied ever telling Lieman that he used no intoxicant other than alcohol; he claimed that counsel asked only about his drunkenness. Petitioner additionally offered credible evidence suggesting that when he said he knew what he was doing, he was referring to his capacity to drive rather than an intent to kill. (See fn. 3, *ante.*)

The referee's implicit assessment of petitioner's testimony is therefore supported by credible evidence. On the facts thus established, it was appropriate for the referee to conclude that counsel's single query regarding petitioner's mental condition on the night of the killing, and his failure to pursue petitioner's contextually ambiguous response, amounted to the effective abandonment of his obligation to " 'investigate carefully all defenses of fact and of law that may be available to the defendant' " and to confer with the client " 'without undue delay and as often as necessary . . . to elicit matters of defense . . . .' " (*People* v. *Pope, supra,* 23 Cal.3d 412, 425.)

3.

The Attorney General next contends that the referee erred in determining that counsel inadequately investigated the testimony of other witnesses. In a strained effort to rationalize the uncontested failure of counsel and his investigator to interview anyone regarding petitioner's intoxication, the Attorney General attributes responsibility for counsel's inaction to a "conspiracy of silence" among potential witnesses. While the witnesses acknowledged that they did not contact Lieman about petitioner's PCP ingestion, this did not extinguish counsel's affirmative obligation to investigate available evidence critical to his anticipated defense. At best, their failure to come forward may bear on the credibility of their subsequent testimony.

The Attorney General observes that two of the three witnesses whom the investigator did contact—Joe Cordero and Vincent Acosta—lied to the investigator about their knowledge of the incident. He implies that their untruthfulness effectively blocked further inquiry, and thus that the scope of the investigation was reasonable. This argument overlooks the fact that Lieman failed to contact at least seven other percipient witnesses. It also ignores the referee's finding that Joe and Vincent, "who were anxious to be helpful to the Petitioner," were interviewed only briefly by telephone and were never asked about petitioner's intoxication. Though their initial lack of veracity might have made Lieman's job more difficult, the Attorney General cannot effectively contend that it justified counsel in abandoning all further factual investigation.

■ While an attorney is not obligated to interview every prospective witness (*People* v. *Floyd* (1970) 1 Cal.3d 694, 710 [83 Cal.Rptr. 608, 464 P.2d 64]), it is patently incompetent for him to interview none regarding the crux of the anticipated defense—here, petitioner's intoxication. ■ Accordingly, the referee was justified in determining that Lieman's investigation of the testimony of percipient witnesses was grievously deficient. (*People* v. *Bess* (1984) 153 Cal.App.3d 1053, 1059-1060 [200 Cal.Rptr. 773]; *People* v. *Rodriguez* (1977) 73 Cal.App.3d 1023, 1031 [141 Cal.Rptr. 118].)

### Counsel's Factual Investigation: Prejudice

■ The Attorney General contends that even if counsel's factual investigation was inadequate, the referee nonetheless erred in determining that the inadequacy prejudiced petitioner's defense. This argument rests on the assertion that "untruth and fabrication pervaded the evidence presented on the petitioner's behalf," rendering improbable a more favorable outcome had the evidence been presented to the jury. The referee's challenged assessment of the veracity and credibility of petitioner's witnesses warrants great weight if supported by substantial evidence. Accordingly, we look to the record to determine whether credible evidence corroborates his determinations.

### 1.

The Attorney General argues initially that the testimony of the petitioner would be subject to impeachment on multiple grounds. He first asserts that petitioner's taped statement to the police is fundamentally inconsistent with his current contentions. Petitioner claimed in the interview that he had heard a loud noise, saw a black car speed away, and had no recollection of the killing. The Attorney General argues that the story is an obvious fabrication and cannot be reconciled with an intoxication defense, particularly in

light of petitioner's apparent lucidity in describing other events occurring that night. However, petitioner introduced the declaration of a psychiatrist experienced in the treatment of PCP intoxication who stated that petitioner's description of the events was consistent with the effects of the drug, including temporary blackouts and paranoid psychosis.

The Attorney General next reasons that petitioner's testimony is impeachable in light of his failure to inform Lieman of his PCP intoxication. Any negative inference drawn from this must be weighed, however, against counsel's extremely cursory consultation with his client regarding his mental condition. Petitioner explained that he did not volunteer the information because "I didn't know if it would have hurted [sic] me more if I would have told him, because I didn't know nothing about the law. [¶] Secondly. I didn't want for my family and my wife's family to know I was smoking PCP." It is not improbable that petitioner, a 20-year-old with a 10th-grade education, would not voluntarily and candidly discuss his ingestion of illegal drugs without some prompting from counsel.

Finally, the Attorney General argues that petitioner's account of his intoxication is inconsistent. He observes that petitioner claimed he smoked the PCP unknowingly, but subsequently told both Rick Vargas and his brother that he was intoxicated by the drug. Again, petitioner offered a credible explanation during his testimony at the reference hearing: he stated that he smoked the marijuana cigarette without knowing it had been dipped in PCP—a claim corroborated by the testimony of Martin Hernandez—but that his subsequent reaction made it apparent that he had ingested the drug. We conclude there is credible evidence in the record supporting the referee's favorable assessment of petitioner's testimonial credibility.

2.

Turning to the credibility of petitioner's other witnesses, the Attorney General asserts that they are similarly subject to impeachment because of their lack of veracity and their "conspiracy of silence" prior to trial. While the referee made no explicit findings regarding the credibility of particular witnesses, he implicitly endorsed their collective credibility when he determined that the omission of their testimony prejudiced petitioner's defense. This implicit determination must be supported by credible evidence to be sustained.

The Attorney General observes that the referee criticized the credibility of Joe Cordero and Vincent Acosta, whose testimony "revealed great cover up . . . when interviewed by the investigator." The referee's report referred to "credibility reservations relating to said witnesses," and specifically noted

that Acosta "told three different stories at three different times." The referee also stated on the record that Martin Hernandez "didn't come over too convincingly." These comments suggest either that the referee did not significantly rely on the testimony of these witnesses in reaching his conclusion regarding prejudice, or that such reliance was not supported by substantial evidence.

With respect to the testimony of Richard Vargas, Charlie Hinojosa, Mary Ellen Cordero and Jenny Ceja,[12] the Attorney General's argument is more tenuous. There is no indication that the referee disbelieved the testimony of these witnesses or that they had made prior inconsistent statements. The only basis for impeachment offered by the Attorney General is their failure to come forward prior to trial and inform Lieman of petitioner's ingestion of PCP. We have already noted that negative inferences from such "silence" must be weighed against counsel's failure to seek out the witnesses, and his more general failure to consult with petitioner's family regarding the defense.

Richard Vargas was not a member of petitioner's family, and testified that "I didn't feel like I was involved . . . ." Ceja and Mary Ellen Cordero both testified they did not speak with Lieman about petitioner's PCP ingestion because they assumed that he knew what he was doing, and because petitioner had indicated that he wanted to be the one to speak with his attorney. Mary Ellen also testified that during the period preceding trial, she "didn't want anybody asking me anything; I didn't want to know anything." The referee explained on the record why he found this response believable: "I could understand a wife, a young person acting as she did because she is working. She has a child. Her husband is being held for a very, very serious charge. She doesn't—she appears to be unfamiliar with legal procedure, so I can understand those things and that is the impression I get about her." Charlie Hinojosa, when asked why he did not volunteer information to Lieman's investigator, replied that "all he wanted to know is about the tool box."

This evidence is sufficient to sustain the referee's implicit assessment of the credibility of Vargas, Ceja, Hinojosa, and Mary Ellen Cordero against the Attorney General's objection. Their testimony, independent of the potentially impeachable testimony offered by Joe Cordero, Acosta, and Hernandez, established that the petitioner was highly intoxicated by PCP and

---

[12] Jenny Ceja, petitioner's sister, had no contact with him on the night of the killing and thus did not testify on the question of his intoxication. Her testimony related to discussions she had with Lieman prior to trial about the defense. She corroborated other testimony regarding Lieman's infrequent contact with petitioner and his family, his cursory factual investigation, and his unresponsiveness when pressed for details of petitioner's anticipated defense.

alcohol both before and after the killing. The testimony of these individuals, coupled with petitioner's own testimony, the testimony of Renee Juarez,[13] the unexplored physical and testimonial evidence of drug usage mentioned in the police report, and the expert's declaration regarding the synergistic effects of PCP and alcohol intoxication on an individual's capacity to premeditate, form intent, and act with malice aforethought, are sufficient to undermine confidence here in the verdict of murder in the first degree. (*Ledesma, supra,* 43 Cal.3d at pp. 223-224; see *People* v. *Bass* (1983) 147 Cal.App.3d 448, 457 [195 Cal.Rptr. 153].) It is significant that the Attorney General, apart from credibility objections, does not dispute that petitioner's evidentiary showing is sufficient to make reasonably probable a more favorable verdict.

The referee's determination that Lieman's inadequate investigation prejudiced petitioner's defense is thus supported by the record. Accordingly, we conclude that Lieman provided petitioner ineffective assistance of counsel by failing to "investigate the facts in the manner of a diligent and conscientious advocate . . . ." (*People* v. *Pope, supra,* 23 Cal.3d at p. 425.)

## V. *Conclusion*

To the extent that we have sustained the referee's findings and upheld his conclusions we adopt them as our own. The judgment of the Court of Appeal is reversed with directions to grant the petition for habeas corpus, vacate the judgment of conviction, remand the petitioner to the Superior Court of Los Angeles County, and direct the clerk to remit a certified copy of its order to the superior court for filing. The Court of Appeal shall direct respondent to serve another copy thereof on the prosecuting attorney in conformity with Penal Code section 1382, subdivision (b).

Lucas, C. J., Broussard, J., Panelli, J., Eagleson, J., Kaufman, J., and Low (Harry W.), J.*, concurred.

**MOSK, J.,** Concurring—My opinion prepared for the court addresses only defendant's contention that his trial counsel, Arnold Lieman, provided him ineffective assistance of counsel by failing to competently investigate a potential intoxication defense. However, Lieman's incompetence reached far beyond his investigatory shortcomings. Counsel continued to disregard petitioner's interests as the course of his purported representation unfolded, until the sum of accumulated failings amounted to such an abandonment of

---

[13] The Attorney General does not dispute the referee's finding that Lieman performed inadequately by failing to explore or introduce at trial the prior testimony of Juarez.

*Presiding Justice, Court of Appeal, First Appellate District, Division Five, assigned by the Chairperson of the Judicial Council.

petitioner's cause as to constitute the constructive denial of assistance altogether. In the absence of this foundational component of the adversarial process, prejudice can be conclusively presumed. (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 217 [233 Cal.Rptr. 404, 729 P.2d 839].)

## I.

In addition to forsaking his responsibility to competently investigate a potential intoxication defense, Lieman defaulted, inter alia, in the following respects:

### A. *Counsel's failure to object to the introduction of petitioner's postarrest statement*

The referee determined that Lieman ineffectively assisted petitioner by failing to object to the introduction, in its entirety, of his taped statement to the police. Included in the admitted tape was a statement by the interrogating detective that the judge who signed the arrest warrant was convinced petitioner killed the victim, inadmissible on both hearsay and relevancy grounds (Evid. Code, § 1200, subd. (a); § 702, subd. (a)); another statement by the detective that "we knew we had a murderer on our hands," irrelevant and inadmissible under Evidence Code section 702, subdivision (a); a third statement by the detective indicating that petitioner had been arrested previously for the theft of gasoline, irrelevant and inadmissible under Evidence Code section 788; and petitioner's exercise of his right to remain silent when asked to describe "what provoked or what started the incident with Mr. Barajas," inadmissible under *Griffin* v. *California* (1965) 380 U.S. 609, 614-615 [14 L.Ed.2d 106, 110, 85 S.Ct. 1229].[1]

The introduction of a judicial officer's preliminary evaluation of petitioner's guilt, or petitioner's exercise of his right to remain silent, could not possibly have related to a competent defense strategy, particularly "since an objection to the . . . evidence would have been adjudicated outside the presence of the jury . . . ." (*People* v. *Nation* (1980) 26 Cal.3d 169, 179 [161 Cal.Rptr. 299, 604 P.2d 1051].) The inadequacy of Lieman's conduct in this regard is manifest. (*People* v. *Ellers* (1980) 108 Cal.App.3d 943, 951 [166 Cal.Rptr. 888].)

---

[1] The *Griffin* rule "prohibits reference to a defendant's failure to take the stand in his own defense" (*People* v. *Szeto* (1981) 29 Cal.3d 20, 34 [171 Cal.Rptr. 652, 623 P.2d 213]), and applies with equal force to a defendant's refusal to answer questions during a postarrest interrogation (*Boyer* v. *Patton* (3d Cir. 1978) 579 F.2d 284).

## B. *Counsel's failure to research and argue defenses of law*

Adequate representation requires an attorney to research " 'carefully all defenses of . . . law that may be available to the defendant . . . .' " (*People v. Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1], quoting *In re Williams* (1969) 1 Cal.3d 168, 175 [81 Cal.Rptr. 784, 460 P.2d 984].) As this court noted in *People* v. *Sedeno* (1974) 10 Cal.3d 703, 717, footnote 7 [112 Cal.Rptr. 1, 518 P.2d 913], counsel's duty "includes careful preparation of and request for all instructions which in his judgment are necessary to explain all of the legal theories upon which his defense rests." The referee found that Lieman violated this duty by requesting an invalid jury instruction on intoxication and diminished capacity (CALJIC No. 8.41 (1979 rev.)), withdrawn approximately one year prior to trial after the Legislature abolished the diminished capacity defense. (Pen. Code, § 28.) As a consequence of this error, the jury received no instructions whatever on intoxication. Counsel compounded the error by seriously misstating the law applicable to an intoxication defense in his closing argument.

Lieman conceded at the reference hearing that he believed the abolished diminished capacity defense remained available at the time of petitioner's trial, evincing an astounding ignorance of the basic legal principles relevant to the defense of his client. The Attorney General says nothing with respect to the incompetence suggested by this admission, as well as the evident deficiency of counsel's related request for an invalid and superseded CALJIC instruction on the legal significance of petitioner's intoxication.

The Attorney General focuses rather on the overarching legal strategy that purportedly informed Lieman's conduct of the defense. He argues that Lieman made a tactical decision to reject a defense based on intoxication and the absence of actual malice or intent, in light of petitioner's statement that he knew what he was doing, and chose instead to press for a voluntary manslaughter verdict based on petitioner's "alcohol-aided anger and passion," an apparent variant of the statutory heat of passion defense.[2] He argues that this reasonable strategic decision explains Lieman's failure to

---

[2] The Attorney General evidently refers to Lieman's closing argument when he speaks of counsel's "alcohol-aided anger and passion" defense. In closing, Lieman stated that "We know Mr. Cordero, in his statement, had been drinking. He says he was high, feeling the effect. He said he was swerving in the statement he gave to the police, mentioned being high or being under the influence several times. [¶] The law does not require someone to be, in the words of the prosecutor, 'blind drunk.' That is not the law. The law is just, someone has to be so moved by heat of passion—and, of course, heat of passion is a term of art, you know, in the legal word [*sic*], which the judge is going to define to you, the sudden quarrel or heat of passion overcomes one's reasoning, and that is what leaves the reduction of a murder to a manslaughter."

request a valid CALJIC instruction on intoxication, since the instructions remaining after the repeal of the diminished capacity defense discussed intoxication only in relation to the negation of intent.[3]

The Attorney General's portrait of a thoughtful legal strategy is belied by Lieman's testimony at the reference hearing. When asked if there was "any practical reason, or any reason at all, why you did not submit [the CALJIC instruction on intoxication and specific intent]," Lieman said nothing about its incompatibility with his theory of the defense. He replied only, "Doesn't it have to be given sua sponte? . . . . Well, I didn't ask for that instruction." The Attorney General's characterization of counsel's defense is rendered even less credible by Lieman's own description of his strategy at trial: "As I saw it, Judge, I had one defense; that the defendant was intoxicated and high, and he was."

If one were to assume arguendo that Lieman's "alcohol-aided anger and passion" argument was a variant of the statutory defense of heat of passion rather than an inelegant attempt to assert the abolished defense of diminished capacity, counsel was required to show that "malice [was] lacking because the killing occurred under circumstances of sufficient provocation such as to rouse the reasonable man to heat of passion or sudden quarrel." (*People* v. *Graham* (1969) 71 Cal.2d 303, 315, fn. 2 [78 Cal.Rptr. 217, 455 P.2d 153]; Pen. Code, § 192, subd. (a).) " '[T]his heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances, and that, consequently, no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.' " (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 326 [185 Cal.Rptr. 436, 650 P.2d 311], quoting *People* v. *Valentine* (1946) 28 Cal.2d 121, 139 [169 P.2d 1].) The Attorney General fails to explain how Lieman could have competently argued that the victim's "provocation" was sufficient to rouse a reasonable man to kill, while evidently suggesting that petitioner's violent response was the peculiar product of his own drunkenness. Exceptional subjective conditions, such as intoxication or mental depression, by definition will not be experienced by the ordinarily reasonable man and are therefore plainly incompatible with

---

[3] CALJIC No. 4.21 (1981 rev.) reads: "In the crime of _____ of which the defendant is accused [in Count _____ of the information], a necessary element is the existence in the mind of the defendant of the [specific intent to _____ ] [mental state of _____ ]. [¶] If the evidence shows that the defendant was intoxicated at the time of the alleged offense, the jury should consider his state of intoxication in determining if defendant had such [specific intent] [mental state]. [¶] If from all the evidence you have a reasonable doubt whether defendant formed such [specific intent] [mental state], you must give the defendant the benefit of that doubt and find that he did not have such [specific intent] [mental state]."

the statutory defense. (*In re Thomas C.* (1986) 183 Cal.App.3d 786, 798 [228 Cal.Rptr. 430].)

If Lieman intended to argue the defense of heat of passion, he did so incompetently by emphasizing petitioner's intoxication and making almost no mention of provocation on the part of the victim.[4] If he intended to argue a defense based on petitioner's voluntary intoxication, requiring proof of the absence of specific intent, premeditation, or malice aforethought under Penal Code section 22, subdivision (b), he did so incompetently by suggesting a diminished capacity standard in closing argument and by requesting a jury instruction withdrawn well before trial. (Pen. Code, §§ 22, subd. (b), 28, subd. (a).)

C. *Counsel's failure to introduce evidence of the ownership of the bullet found in the trunk of petitioner's car*

Lieman failed to call petitioner's brother-in-law, Charlie Hinojosa, to establish his ownership of a bullet found in petitioner's trunk. In the absence of Hinojosa's testimony, the prosecutor drew a number of negative inferences from the unrefuted connection of ammunition to petitioner.

The prosecutor noted in closing argument that the bullet was of a caliber different from the one that killed the victim. He then said, "Maybe it's a good luck charm, maybe he has two guns, maybe he found that bullet someplace to try to load it into his gun and discovered it wouldn't fit. [¶] And the other thing is, . . . remember that Mr. Cordero told Detective Athan, you heard it on the tape recording, that he's never had a gun in his car. So what is the bullet doing there, then?"

Petitioner's counsel at the hearing inquired whether Lieman had "any information that Hinojosa could have said something in his testimony that would have been to the detriment of your client." Lieman replied, "no, I had no information." While "the choice of which, and how many, of potential witnesses [will be called to testify] is precisely the type of choice which should not be subject to review" (*People* v. *Floyd* (1970) 1 Cal.3d 694, 709 [83 Cal.Rptr. 608, 464 P.2d 64]), the failure to present the only available

---

[4] The only portion of Lieman's closing argument that could possibly be construed as a discussion of the victim's provocation stated: "The victim must have gone over to the trunk for a purpose. Perhaps he wanted to get some kind of revenge, perhaps he wanted to strike Mr. Cordero, perhaps because of the hour, where he was at, his state of mind, he had had a few beers, too, apparently, the calling Mr. Cordero was doing, he went over to the trunk for some reason." Referring to "the calling Mr. Cordero was doing" appears to concede that petitioner himself acted provocatively; but this would preclude a heat of passion defense, because "the provocation must [come] from the victim." (*In re Thomas C., supra,* 183 Cal.App.3d at p. 798; see *People* v. *Spurlin* (1984) 156 Cal.App.3d 119, 125-126 [202 Cal.Rptr. 663].)

exculpatory testimony on a significant issue, absent a perceived risk, is evidently deficient.

## II.

As this court observed in *Ledesma,* "In certain contexts, prejudice is conclusively presumed. For example, 'Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice. . . .'" (*Ledesma, supra,* 43 Cal.3d at p. 217, quoting *Strickland* v. *Washington, supra,* 466 U.S. at p. 692 [80 L.Ed.2d at p. 696].) In view of the totality of Lieman's failings in this case, I am compelled to conclude that his deficient performance—or, perhaps more accurately, his essential nonperformance—amounted to the "constructive denial of the assistance of counsel altogether." Such constructive denial is present when "the process loses its character as a confrontation between adversaries . . . . [I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." (*United States* v. *Cronic* (1984) 466 U.S. 648, 656-659 [80 L.Ed.2d 657, 666-668, 104 S.Ct. 2039].)

In a concurring opinion in *Ledesma,* Justice Grodin, joined by then-Justice Lucas and Justice Panelli, concluded that the broadly deficient performance of the defendant's trial counsel constituted the constructive denial of assistance. They predicated their conclusion on the following litany of failings: "Counsel's failure to investigate defenses that should have been apparent to him; his failure to utilize available evidence and objections; his admission that his trial preparation and performance were essentially nil . . . coupled with the other omissions identified by [the] referee preclude any confidence in the verdict of first degree murder . . . . [¶] In circumstances in which it is established that although counsel has been afforded a defendant, he is unable to discharge his duties, it is unnecessary to identify specific prejudice. . . . [Defendant] has established that counsel's performance was so deficient as to bring about a breakdown of the adversarial process . . . ." (*Ledesma, supra,* 43 Cal.3d at p. 245 (conc. opn. of Grodin, J.).)

Lieman conducted no factual investigation of petitioner's sole defense of intoxication, a deficiency that led inexorably to its virtual withdrawal at trial; he called no witnesses nor utilized any available exculpatory evidence; he made no pretrial motions, offered no opening statement, and failed repeatedly to object to the prosecutor's introduction of clearly inadmissible evidence; and he conducted his entire defense under an inexcusable misapprehension of the law applicable to the charge against his client. Counsel for Ledesma, while grossly incompetent, did more: he moved before trial for

the appointment of an expert to evaluate a potential diminished capacity defense, he called witnesses at trial, and he introduced exculpatory evidence. (*Ledesma, supra,* 43 Cal.3d at pp. 178-191.) If, as Justices Grodin, Lucas, and Panelli concluded, Ledesma was constructively denied the assistance of counsel, it follows a fortiori that petitioner was also.

In sum, the words of the *Frierson* court are strikingly applicable to the facts here: "[Counsel's diminished capacity defense] was doomed to failure in the absence of any competent evidence supporting it. By his inaction, deliberate or otherwise, counsel deprived himself of the reasonable bases upon which to reach *informed* tactical and strategic trial decisions. Most importantly, the defense of diminished capacity was certainly *crucial,* for it represented defendant's *sole* defense to the serious, indeed ultimate, crimes with which he was charged. The situation thus became comparable to that presented in *People* v. *Corona,* wherein defense counsel called no witnesses and presented no defense at trial other than to cross-examine prosecution witnesses . . . . 'To give up the mental incapacity defense in this situation was tantamount to a total withdrawal of any legal defense, a complete abandonment of the interest of the accused.'" (*People* v. *Frierson* (1979) 25 Cal.3d 142, 163 [158 Cal.Rptr. 281, 599 P.2d 587], quoting *People* v. *Corona* (1978) 80 Cal.App.3d 684, 719 [145 Cal.Rptr. 894], citation omitted, italics in original.)

Broussard, J., concurred.