Filed 4/15/13  P. v. Lazcano CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ADAN LAZCANO,<br><br>    Defendant and Appellant. | B234366<br><br>(Los Angeles County<br>Super. Ct. No. TA113013) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Richard R. Ocampo, Judge.  Affirmed.

John A. Colucci, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Linda C. Johnson and Robert M. Snider, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Adan Lazcano appeals from the judgment upon his conviction of murder in the first degree and of Penal Code section 12022.53 firearm discharge allegations.[1] Appellant asserts that his judgment should be reversed because the lower court erred: (1) in admitting evidence of alleged prior uncharged criminal conduct; (2) in failing to instruct the jury on the lesser included offense of heat of passion manslaughter; and (3) during sentencing to orally pronounce that the parole revocation fine was suspended. Appellant also claims that his trial counsel was ineffective for failing to request a pinpoint instruction with CALCRIM No. 522 on provocation. As we shall explain, only appellant's contention about his sentence has merit. Nonetheless, remand is unnecessary because the abstract of judgment reflects the proper suspension of the fine. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  Apellant's Relationships

Appellant's nickname is "Panda." Appellant did not have gang monikers or tattoos, and is not a gang member. Appellant and Jesus Abarca have been good friends since 2010. They would see each other almost daily. Appellant met Jesus' cousin Francisco Abarca in March 2011. Jesus ("Chuito") and Francisco ("Chuy") grew up together and were like brothers.[2] Appellant and Chuy became friends.

### B.  Appellant's Statements

Appellant was heard to quote underground Latino music, saying "I learn to live life and then I learned to take lives." Appellant had told Chuy, "I have knocked people down" and "I have taken people down," but never provided details. Appellant made similar boasts in groups of friends. Appellant said he was a pistolero, meaning gunman. Chuy thought appellant's boasts were said in the spirit of the music, which glorified violence and the Mafia. In Spring 2010, Chuy told appellant he had a .22-caliber

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

[2]     As Jesus and Francisco share the "Abarca" last name, they will be referred to by their familiar names for clarity: Jesus is "Chuito" and Francisco is "Chuy."

2

handgun.  Appellant told Chuy that appellant once had a nine-millimeter handgun and still had bullets for it.

## C.     *Night of the Murder*

On the night of June 26, 2010, Chuy hosted a backyard rave at an abandoned house in Compton, across the street from his residence.  Chuy brought his girlfriend, Priscilla Manzo ("Manzo"), and his cousin Paola Santa Cruz.  It was Manzo's birthday.  About 80 people attended the party.  Guests were purchasing nitrous oxide balloons filled from tanks.[3]

### 1.     *Events Leading Up To The Murder And The Murder*

Manzo's prior boyfriend, Jaime Jauregui, who was intoxicated, confronted Chuy.  In response to Jauregui's question asking him "where [he was] from," Chuy replied "I don't gang-bang."  Jauregui continued to speak to him, but Chuy walked away.

Around 10:00 p.m., appellant arrived at the party with Chuito, Chuito's younger brother Christian Abarca, and Chuy's brother Javier Abarca (who was also friendly with Appellant).[4]  Then Jauregui and two of his friends, one of whom was Pedro Martinez ("Victim"),[5] approached Chuy.  Acting under the belief that Chuy owned the house, Jauregui confronted Chuy about a nitrous oxide tank that someone was preventing them from bringing onto the premises.   Jauregui said he had a .45-caliber weapon in the event that he was met with resistance.

Frightened, Chuy retrieved a .22-caliber revolver from his residence across the street and brought it to the party for protection.  Appellant asked to hold it several times,

---

[3]     Nitrous oxide is an inhalant used to cause lightheadedness and dizziness for a couple minutes.   The nitrous oxide gas is commonly referred to as "noz."

[4]     As Christian and Javier also share the "Abarca" last name with Chuy and Chuito, they will be referred to by their first names for clarity.

[5]     Though he is named as "Pedro Martinez" in the information, Pedro is referred to in the record as both Pedro Martinez and Pedro Hernandez.  Due to this disparity and because he is the victim in this case, he will be referred to as "Victim."

3

telling Chuy, "I will respond for you; you know this." Appellant asked for the gun because Chuy was inhaling nitrous oxide and was acting "crazy." Appellant was not drinking, doing drugs, or using nitrous oxide during the party.[6] In the past, Chuy had lent the weapon to appellant when asked. When Chuy finally handed appellant the handgun, appellant said "If anything happens, I got your back." Chuy said he was having problems with the man who had confronted him. Appellant thought someone in Jauregui's group had a gun.

At this time, Victim, one of Jauregui's friends, was intoxicated and confrontational, disturbing other guests with his behavior. He had been pushing and cutting ahead of guests lined up to buy nitrous oxide balloons, grabbing balloons out of hands and refusing to pay for them. People did not want to "mess with him" because "he didn't look like he was all there." Chuy told appellant that Victim had confronted him and asked what gang he was affiliated with. Appellant believed Victim was a gang member based on Victim's clothing and behavior.

Victim then initiated a fight with Manzo. Victim stepped on her feet, and upon his statement that he was from Compton, she said she was from Compton too. Victim then pushed Manzo, saying "I am not afraid to hit a bitch," while holding a nitrous oxide balloon in each of his hands. Victim shoved her with closed fists. When Manzo responded by saying "I am not afraid to hit you back," Victim raised his fists as though he meant to punch Manzo. Manzo cried out three times for Chuy's help.

When Chuy responded to the cries, Victim turned his attention away from Manzo and on to Chuy, and appellant stood behind Chuy to observe. Victim came within five inches of Chuy's face and asked "what's up? You got a problem, ese? What are you going to do about it?" With these actions, Victim was instigating a fight with Chuy, but he never actually hit Chuy or Manzo. Chuy began to argue with Victim. Chuy was afraid that Victim was going to hit him. While stepping back with his hands open, Chuy asked Victim, "Why you gotta be disrespecting the ladies?" Chuy said, "that's my girl

---

[6] The record reflects that appellant had been smoking marijuana at the party.

4

you are disrespecting." Chuy and Victim argued for about a minute, but Victim neither hit nor attempted to hit Chuy.

While holding the balloons, Victim reached into his waistband, saying he had a .45, but nothing was withdrawn. Appellant stated that he saw Victim trying to reach for something, but that he did not see Victim holding any balloons nor a weapon. Appellant could not see Victim's hands because it was too dark. Within seconds, appellant stepped toward Victim, reached into his own waistband, withdrew his gun, extended it toward Victim's head, and shot Victim once in the right temple at close range.

Appellant said he saw Victim acting crazy and thought Victim was going to hurt Chuy or Manzo when he "saw a reaction on Victim," causing appellant to panic and "snap." Appellant took a close shot because he did not want to shoot someone else accidentally. Victim fell to the ground and died from that single gunshot wound to his head.

Victim had been unarmed, had not thrown any punches, or said or done anything threatening.[7] Appellant testified that he was afraid Victim might shoot him, Manzo, Chuy, Chuito, or Javier.[8] As appellant approached Victim, appellant saw Victim trying to reach for something. Appellant was afraid that since Victim had been inhaling nitrous oxide, he could have caused harm to Manzo or Chuy if he had a gun. Appellant was scared and acted quickly, without thinking about whether Victim had a gun or what Victim was going to do.[9] Victim never approached appellant, and appellant never heard him threaten to kill anyone.

---

[7]     Manzo later stated to a detective that Victim had told her, "I got a .45 for you." She never stated that Victim had been holding two inflated balloons.

[8]     This is directly contradicted by other witness testimony, which stated that appellant did not claim that he feared for his life or safety, or anyone else's. Also, appellant did not express any fear of Victim.

### 2. Aftermath of the Murder

Appellant was momentarily frozen, then ran across the street; Chuy and Manzo remained frozen from shock. Javier yelled, "He shot him, he shot him in the head! Chuy, Chuy, let's go, let's go." Chuy and Manzo walked home. A deputy sheriff responded to the murder, where he found a couple dozen people leaving. Two men were propping up Victim's body, which had no weapons near it.

In his backyard, Chuy came across Javier, Chuito, Christian, and appellant. Appellant was calm, quiet, and relaxed. Appellant stated that he appeared calm but was actually panicked and in shock. "Nobody fucks with me," appellant stated.[10] "It wasn't me," appellant and Chuito each said in Spanish. Replaying a song on his phone, appellant repeated to Chuy, "I told you I would respond for you if anything happened." "I told you I could knock people down," appellant stated. Appellant said Victim had a .45, but he never claimed he was defending himself, Chuy, or Manzo.[11] Appellant told Chuito that he knew it was wrong, but that he was scared and snapped when he shot Victim.

Appellant asked that no one tell his girlfriend what happened. Around 1:00 a.m., appellant left, stating he had hidden Chuy's gun. Appellant stated that he returned the gun to Chuy prior to getting a ride home. Chuy thanked appellant for "having his back."

### D. Murder Investigation

The next day, June 27, 2010, Los Angeles County Sheriff's Detective Richard Ramirez and his partner spoke with Chuy after Chuy's residence was searched. Chuy denied owning a .22-caliber handgun, saying that the found casings came from a shooting range. Chuy was taken into custody and was arrested for murder. Manzo then told the

---

[9] This is also directly contested by other witness testimony claiming that appellant said nothing about having seen Victim with a weapon or having acted in Chuy's or Manzo's defense.

[10] Appellant, however, claimed that he never boasted about the shooting.

[11] Upon two subsequent interviews, Javier never mentioned appellant's allegation that Victim had a .45-caliber weapon.

police the shooter was appellant, not Chuy. Chuy also told detectives that appellant had shot Victim. He picked appellant out of a photo array and wrote "He ran up and shot the guy in the head."

### 1. Questioning Appellant

On June 29, 2010, police arrested appellant. Appellant did not contact investigators prior to that date. Detectives recorded a series of conversations with appellant, and these recordings were played for the jury. Appellant had never been questioned before, and was scared when interviewed about the homicide. He was afraid of being punished. In the first conversation, appellant denied shooting anyone. Following a break, Detective Ramirez asked appellant if he wanted to discuss the incident further, at which point appellant said, "Okay, I did it." Appellant did not want to talk further about what happened or why.

Appellant then provided some details, telling the detectives that Victim was "mad-dogging" him.[12] Appellant admitted to shooting Victim, stating several times that he was afraid and scared. When asked whether he shot Victim because he believed Victim was going to hurt Chuy, appellant answered no. Appellant also stated that while it appeared to him that Victim and Chuy were going to fight, the two were only arguing and it had not yet escalated to physical violence.

When asked whether he thought Victim had a gun or whether he had heard that Victim had a ".45," appellant did not reply affirmatively. Appellant finally said he obtained the gun from Chuy and had returned it after the shooting; he waited until the end of the interview because he did not want to get Chuy in trouble. During the interview, appellant repeatedly told the officers that he shot Victim because he was scared, that he thought Victim was a "gangster." Prior to trial, appellant never told the police that he acted in self-defense or in defense of his friends.

---

[12]    "Mad-dogging" means to look at someone so as to initiate confrontation.

7

### 2. Chuy Is Granted Immunity

Chuy subsequently admitted to Detective Ramirez that he had provided the gun. When the detectives asked Chuy to retrieve it, he agreed. However, on his parents' advice, he moved the gun and did not produce it for the detectives. Chuy was then charged as an accessory after the fact.

Chuy signed an immunity agreement, which required his truthful testimony in exchange for three years probation, with credit for time served in custody and no additional confinement absent a probation violation. On February 11, 2011, Chuy reaffirmed to detectives that he provided the murder weapon. Later, with the consent of his attorney, Chuy attempted to recover the gun, but it had been discarded.

### E. Charges Against Appellant

On December 3, 2010, the Los Angeles County District Attorney charged appellant with murdering Victim in violation of section 187, subdivision (a). The information filed also alleged that appellant personally used and intentionally discharged a firearm, causing great bodily injury and death to Hernandez, pursuant to section 12022.53, subdivisions (b) through (d).

Appellant pled not guilty and denied special allegations, and on April 1, 2011, a jury trial commenced. Following argument, the People moved to add a special allegation pursuant to section 12022.5, subdivision (a); the court granted the special allegation. The court instructed the jurors about imperfect self-defense, voluntary manslaughter, and homicides justifiable in self-defense or in the defense of another.

### 1. Section 402 Hearing

A pretrial hearing was held pursuant to Evidence Code section 402 regarding appellant's alleged statements that he had "knocked people down before" and that he was a "gunner" or "pistolero." During the Section 402 hearing, the prosecutor offered Appellant's statements "merely to show his state of mind, his motive, which all directly is relevant and extremely probative to the central issue in this case as to why the defendant did what he did." The prosecutor explained to refute the anticipated defenses of accident or defense of oneself or others, appellant's statements would show premeditation and

deliberation "that he was doing this to show off and to prove that he is the tough guy that he believed – that he had been bragging about."

Appellant objected pursuant to Evidence Code section 352, as well as state and constitutional grounds, stating that "jurors undoubtedly will consider [appellant] to be someone who has killed in the past." Appellant further argued that the vague nature of the statement would make it difficult to rebut the truth of the statement with independent evidence, and that it would be unfair to allow uncorroborated evidence to be provided by witnesses granted with immunity. The court agreed that the statement allegedly uttered by appellant, "I have taken people down before," presented an Evidence Code section 352 problem. To remedy this, the prosecutor stated that witnesses testifying to the statement did not believe appellant to be someone who had killed before, and would testify to the fact that he was simply attempting to prove himself to be a tough guy to his friends.

Following a defense voir dire, the court found the admission of this fact "would be highly relevant" for the issues of intent and premeditation. The court found the evidence more probative than prejudicial, holding that the statement would be permissible as long as there was no evidence of a prior murder, the statement was not being used to show appellant was involved with a prior murder, and there would be jury instructions to that effect. All parties agreed to have the court provide limiting instructions to the jury.

Chuy testified to the relevant statements made by appellant, stating that appellant had said "I have knocked people down" and "I have taken people down," but that Chuy understood it "as just trying to show off to me, just to try to be in the group, I guess." Chuy continued to speak of appellant's tendency to brag about prior crimes but never provided details. During Chuy's testimony, the court provided the jury with the instruction that the statement was not to be used for the truth of the matter; the statement could only be interpreted to explain appellant's state of mind, and could be used for no other reason. On redirect examination, Chuy reiterated that those comments by appellant were never believed, but rather taken as a boast in an effort to fit in with the group.

9

Chuy further testified to the fact that appellant told him he used to have a gun, and that appellant still had bullets for it. Chuy stated that appellant had said this in reply to Chuy's own statement that he owned a handgun. When defense counsel moved for mistrial based on this evidence showing a propensity to own guns or shoot people, the court disagreed. The court found that this statement was showing appellant's tendency to brag, that its relevance outweighed its prejudicial effect, and that there was no harm in allowing the jury to hear it.

When Chuy's brother Javier later testified he heard appellant speak of being a "pistolero," defense counsel renewed the motion for a mistrial, again alleging that prejudicial character evidence was being put before the jury. The court rejected the defense's argument. The court found the statement was properly admitted pursuant to the court's prior ruling and was relevant to show appellant's tendency to brag, and his state of mind. The prosecutor then clarified for the jury that Javier believed appellant was simply bragging, and was not asserting the truth of the statement.

### 2. *Appellant's Trial Testimony*

On the night of the incident, Chuy called appellant to tell appellant about the party at Chuy's house. Appellant's cousin dropped him off at the party at approximately 9:30 p.m. Appellant entered the party with Manzo, Chuy's girlfriend. Though this was a "noz" party, appellant stated that he does not do drugs. Within 10-15 minutes of Appellant's arrival, Chuy told appellant that he had a gun with him because "some guy confronted him" and the individuals who "banged on him"[13] were present at the party. Appellant understood that the people who "banged on" Chuy belong to the same group as Manzo's ex-boyfriend.

Appellant noticed that Victim had been walking around the party, "acting crazy, dumb," and in his opinion, it seemed that Victim was on drugs. Appellant asked Chuy

---

[13]     The phrase "banged on him" refers to an interaction where a question is posed by a person usually affiliated with one particular gang to find out whether the person being asked is affiliated with any gang.

for Chuy's gun because appellant remembered that at another similar "noz" party, Chuy "was doing noz, and he was going crazy." Upon giving him the gun, Chuy told appellant "hold it; but just like have my back." From about 12 feet away, appellant saw Manzo and Victim having an argument, but he could not hear what was said because of the loud music that was playing. Appellant saw Victim shove Manzo, which caused her to move back; Manzo looked at Chuy and Chuy walked over to her. Appellant then walked over to stand beside Chuy, as Chuy and Victim stood face-to-face.

Appellant walked 12 steps toward Victim, pulled the gun out of his back pocket, and shot Victim once, in the head. When Chuy gave appellant the gun, Chuy had told appellant, "if anything happens, be right there to help me. So he gave it to me." When Appellant "saw a reaction on [Victim]," appellant "snapped." When Appellant shot Victim, appellant believed Victim was going to hurt Chuy or Manzo. He was scared that Victim might have a gun, and that he might shoot Manzo, Chuy, Chuito, Javier, or himself. When asked if he was angry with Victim or if he was in fear for Chuy and Manzo, appellant again stated that he was in fear for Manzo, Chuito, Chuy, Javier, and for himself.

Though appellant said he could not see Victim's hands or the balloons in Victim's hands because it was too dark, he also stated that he saw Victim reach for something. Appellant stated that he panicked and had to act quickly because he was in fear, but that he never heard Victim say to anyone that Victim was going to kill them. Appellant further testified that he shot Victim from close range because he did not want to hurt anyone else, that he thought about his action enough to consider others' safety.

After the shooting, appellant ran to Chuy's backyard house and waited five minutes before others arrived. Appellant asserts that he was in "a calm like panic, shock" and that he did not brag about the incident. At the house, Chuy thanked appellant for "being there" for him. When he reemerged from the backyard to the street, appellant saw police officers investigating the shooting, but instead of telling the officers that he had shot Victim in self-defense, he left the scene. After two and a half hours at Chuy's residence and after returning the gun to Chuy, Chuito's mother took appellant home.

11

Appellant did not attempt to contact the police to explain what had happened. When the police arrested appellant two or three days later, appellant was initially scared. At first, appellant denied shooting Victim, but ultimately admitted to it. Appellant did not mention to the police that he used Chuy's gun because he did not want to get Chuy in trouble. Appellant repeatedly told the police that he was afraid of Victim because he believed that Victim was a gangster. Appellant again stated that he was acting in an attempt to protect Chuy and Manzo.

The jury convicted appellant of first degree murder and found true the allegation that he personally and intentionally discharged a firearm, causing death. At sentencing, the trial court denied appellant probation and sentenced him to 25 years to life in state prison and, consecutively, 25 years to life for the firearm enhancement, for a total term of 50 years to life imprisonment. The court imposed fines and fees upon appellant. Appellant received presentence credit for 377 actual days in local custody.

Appellant timely filed this appeal.

## DISCUSSION

### I.     Trial Court Did Not Err in Admitting Evidence of Prior Purported Uncharged Criminal Conduct

Appellant contends that the statements that he had "knocked people down before" and that he was a "gunner" or "pistolero," were inadmissible (1) under Evidence Code section 1101, because the statements portray appellant as a violent character with a propensity to commit violent crimes; and (2) because the evidence was unduly prejudicial under Evidence Code section 352. The Attorney General counters that the evidence was properly admitted to show appellant's state of mind, motive, and intent at the time of the murder, rather than to show his character as one with the disposition to commit murder and that the evidence was more probative than prejudicial under Evidence Code section 352.

12

### A. *Standard Of Appellate Review*

"A trial court's exercise of discretion under [Evidence Code] section 352 will be upheld on appeal unless the court abused its discretion, that is, unless it exercised its discretion in an arbitrary, capricious, or patently absurd manner." (*People v. Thomas* (2012) 53 Cal.4th 771, 806, internal citations omitted.) In fact, "[a] court need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing functions under Evidence Code section 352." (*People v. Hinton* (2006) 37 Cal.4th 839, 892.)

Additionally, the standard of review of a trial court's ruling on the admissibility of evidence of other crimes, under Evidence Code section 1101, is also abuse of discretion. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004.) This presents a significant burden upon the appealing party to show the court's abuse of discretion as an overt disregard for the requisite balancing of probative versus prejudicial value of the facts presented.

### B. *Evidence Code Section 1101, Subdivision (b)*

The Evidence Code section 1101, subdivision (b) challenge centers on whether the statements were evidence of prior bad acts that would show appellant's disposition to commit murder or whether they were presented to prove that he had a homicidal motive or mindset at the time of the murder. The trial court found that appellant's statements were not evidence of prior uncharged crimes, but rather highly relevant to appellant's motive of showing off to prove himself to the others at the time of the murder.

Under Evidence Code section 1101, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code. §1101, subd. (a).) "Evidence that a defendant committed crimes other than those for which the defendant is then being tried is barred by Evidence Code section 1101 if it is offered to prove the defendant's criminal disposition, but not if it is offered to prove a material disputed issue

13

such as motive or intent." (*People v. Hayes* (1990) 52 Cal.3d 577, 617, internal citations omitted.)

Appellant's statements were offered to show appellant's state of mind at the time of the murder rather than to prove that appellant had committed prior crimes. In fact, because testimony of appellant's statements was accompanied by testimony as to their fictitious nature and because they merely refer to the unspecified and unsubstantiated possibility of prior bad acts, the statements do not run afoul of Evidence Code section 1101.

Specifically, Chuy testified that appellant had repeatedly bragged about killing people; he further stated that he never believed appellant actually did kill anyone and, in fact, believed appellant made the statements in an effort to impress him. Javier testified that appellant had told him he was a "pistolero," but also stated that that he believed appellant was just bragging. Chuy also testified that while appellant had mentioned that he used to own a gun and still had bullets for it, he never produced details about his gun use. Here, the statements serve the purpose of showing appellant's state of mind at the time of the murder and his intent.

Additionally, admission of appellant's statements did not prejudice the jury into punishing him for having a criminal propensity. First, appellant himself had admitted to shooting Victim, so there was no need for the jury to rely on vague, unsubstantiated, and alleged prior bad acts referenced in witness testimony in order to decide if he had the character to commit such a crime. Second, both witnesses providing testimony of the statements concurrently testified they did not believe the statements to be true. Thus there was no danger that a juror might take those words to mean appellant had actually committed any prior crime. Finally, to minimize any improper use of the evidence or potential prejudice the court admonished the jury on the limited purpose of this evidence.

Here, the possible prejudicial nature of appellant's statements is eclipsed by the abundant evidence of his guilt as well as the precautionary measures taken by the court and the prosecution. The court did not abuse its discretion in admitting the statements for the purpose of showing appellant's boastful state of mind at the time of the murder.

14

## C.   *Evidence Code Section 352*

Appellant's Evidence Code section 352 challenge centers on the argument that the court abused its discretion by not accounting for the risk of prejudice and instead, acted in a patently absurd manner.  In doing so, appellant ignores the balancing process required of the court, and instead asserts that all prejudicial evidence of this nature should be inadmissible, regardless of probative value.

Under Evidence Code section 352, the trial court "in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352.)

When appellant objected to the admission of the statements at issue, the court held an Evidence Code section 402 hearing to determine the admissibility of the statements.  During this hearing, the prosecution stated that it was offering appellant's statements "merely to show his state of mind, his motive, which . . . is directly relevant    . . . to the central issue in this case as to why the defendant did what he did."  The purpose of this evidence was to prove that his state of mind was deliberate and premeditated, precluding the anticipated defense of accident or defense of himself or others.  Though the court initially expressed a concern that there might be an Evidence Code section 352 problem, after conducting a defense voir dire, it found the admission of the statements to be "highly relevant" for determining intent and premeditation.

We agree with the trial court that this evidence was probative to issues of appellant's state of mind and intent at the time he committed the charged crime.  Any potential prejudice from these statements was neutralized both by the witnesses' statements that they viewed them as false braggadocio and by the limitations and admonitions that the court placed on the evidence.  The trial court admitted the statements with the proviso that no evidence of a prior murder was brought forth; the statement was thus not being used to show appellant was involved with a prior murder.  The court also admonished the jury as to the proper use of the evidence.  Indeed, during

15

Chuy's and Javier's testimony, the court instructed the jury that the statements were to be considered only to explain appellant's state of mind, and that the truth of the statements was not at issue. The trial court here took sufficient precautions in an effort to decrease the risk of prejudice. The court did not abuse its discretion in admitting the evidence under Evidence Code section 352.

## II. Trial Court Did Not Err by Refusing to Instruct on the Lesser Included Offense of Heat of Passion Manslaughter

### A. Elements For Jury Instructions On Heat Of Passion Manslaughter

"Manslaughter, a lesser included offense of murder, is 'the unlawful killing of a human being without malice.' [Citation.] A defendant lacks malice and is guilty of voluntary manslaughter in 'limited, explicitly defined circumstances: either when the defendant acts in a sudden quarrel or heat of passion, or when the defendant kills in unreasonable self-defense – the unreasonable but good faith belief in having to act in self-defense." (*People v. Blakeley* (2000) 23 Cal.4th 82, 87-88, citing § 192.) "Malice is presumptively absent when a defendant kills 'upon a sudden quarrel or heat of passion,' provided that the provocation is sufficient to cause an ordinarily reasonable person to act rashly and without deliberation, and from passion rather than judgment. [Citation.] Similarly, when a defendant kills in the actual but unreasonable belief that he or she is in imminent danger of death or great bodily injury, the doctrine of 'imperfect self-defense' applies to reduce the killing from murder to voluntary manslaughter. [Citation.]" (*People v. Cruz* (2008) 44 Cal.4th 636, 664, citing § 192.)

"[A] trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence. [Citation.] It is error for a trial court not to instruct on a lesser included offense when the evidence raises a question whether all of the elements of the charged offense were present, and the question is substantial enough to merit consideration by the jury. [Citation.] When there is no evidence the offense committed was less than that charged, the trial court is not required to instruct on the lesser included offense. [Citation.]" (*People v. Booker* (2011) 51 Cal.4th 141, 181.) Lesser included offense instructions are "required only where there is 'substantial

16

evidence' from which a rational jury could conclude that the defendant committed the lesser offense, and that he is not guilty of the greater offense. [Citations.]" (*People v. DePriest* (2007) 42 Cal.4th 1, 50; see *People v. Breverman* (1998) 19 Cal.4th 142, 162, 165-169; *People v. Barton* (1995) 12 Cal.4th 186, 194, 195.) Substantial evidence, in this context, is "evidence from which a jury composed of reasonable [persons] could conclude [ ] that the lesser offense, but not the greater, was committed." (*People v. Breverman*, *supra*, 19 Cal.4th at p. 162, internal quotation marks omitted; see also *People v. Barton*, *supra*, 12 Cal.4th at p. 201, fn. 8.) "Speculation is an insufficient basis upon which to require the trial court to give an instruction on a lesser included offense." (*People v. Wilson* (1992) 3 Cal.4th 926, 942.) If the evidence supporting the proposed lesser included offense is minimal and insubstantial, the trial court need not instruct on its effect. (*People v. Jackson* (1980) 28 Cal.3d 264, 306, overruled on other grounds by *People v. Cromer* (2001) 24 Cal.4th 889, 898.) A claim that the trial court erred by failing to instruct on a lesser included offense is reviewed de novo. (*People v. Waidla* (2000) 22 Cal.4th 690, 733.)

### B. Analysis

At trial, appellant argued that he was not guilty of murder because he had acted in defense of himself and his friends. Appellant did not make any argument in the trial court that he committed the crime in the heat of passion. Nonetheless, before this court, appellant contends that the trial court erred for failing to instruct on heat of passion manslaughter. We disagree. Appellant overlooks the fact that there must be substantial evidence of the lesser offense that would lead the fact finder to believe that the lesser, and not the greater, offense was committed. (*Cruz*, *supra*, 44 Cal.4th at p. 664.)

The doctrine of imperfect self-defense "applies to reduce the killing from murder to voluntary manslaughter" "when a defendant kills in the actual but unreasonable belief that he or she is in imminent danger of death or great bodily injury." (*Cruz*, *supra*, 44 Cal.4th at p. 664.) Appellant asserted such fearful belief and intention to act upon that belief. He stated his belief that someone in Victim's group had a gun at the party, that Victim was a gang member, that Victim was acting crazy, and that Victim was going to

17

hurt his friends. Indeed, appellant's trial counsel stated, in both the opening and closing statements, that the theory upon which appellant rested his case was that of self defense.

Appellant now speciously asserts that "there was substantial evidence that [appellant] acted in the heat of passion in the midst of a quarrel with his friends provoked by [Victim]," which would trigger the requirement of a sua sponte instruction on heat of passion manslaughter. Such an instruction would be required only if there was, in fact, substantial evidence that the lesser included offense occurred rather than the greater offense. Heat of passion requires that the defendant "actually, subjectively, kill[s] under the heat of passion … and the heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances." (*People v. Rogers* (2009) 46 Cal.4th 1136, 1168-1169.) The record below provides neither justification for any objective cause of heat of passion, nor evidence to prove that appellant subjectively acted under the heat of passion.

Although there was evidence of the victim's provocative actions, there was no evidence of provocation directed at appellant. Thus, no heat of passion instruction was required. "An unlawful killing is voluntary manslaughter only 'if the killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an 'ordinary [person] of average disposition … to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' [Citations.] The provocation must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment. Adequate provocation must be affirmatively demonstrated. [Citations.]" (*People v. Thomas*, *supra*, 53 Cal.4th at 813; citing *People v. Breverman* (1998) 19 Cal.4th 142, 163, and *People v. Lee* (1999) 20 Cal.4th 47, 60.)

The record reflects no such provocation. Appellant testified that when he saw Victim acting crazy, he thought Victim was going to hurt his friends, and when he "saw a reaction on [Victim]," it caused appellant to panic and "snap." This testimony shows appellant's thought process and action in defense of his friends, rather than an impulsive act brought on by provocation. The fact that he "snapped" implies a sudden action, but it

18

was in response to the threat of injury he feared for himself and his friends rather than in response to a provocation. In fact, appellant testified that Victim never approached him, Victim never threatened to kill anyone, and appellant did not see Victim holding anything at the time of the killing (though others testified to the fact that he was holding balloons in both hands). Appellant further testified that he took a close shot because he did not want to shoot someone else accidentally. This deliberate action shows thought and consideration that does not support the assertion of acting in the heat of passion. While a trial court has the duty to instruct on "general principles of law that are closely connected to the facts before the court and that are necessary for the jury's understanding of the case," nothing required the trial judge below to, as in *People v. Moye*, "disregard the evidence in order to find that the jury should consider whether the defendant subjectively killed in the heat of passion, when no substantial evidence supported that theory of manslaughter …" (*People v. Moye* (2009) 47 Cal.4th 537, 554.) Accordingly, the lower court did not err in not instructing on failing to instruct on a "heat of passion" theory of manslaughter.

## III. *Counsel was not Ineffective for Failing to Request Pinpoint Instruction with CALCRIM No. 522 on Provocation*

A criminal defendant has the right to the effective assistance of counsel. (U.S. Const., Amend. VI; Cal. Const., art. I, § 15; *McMann v. Richardson* (1970) 397 U.S. 759, 771, fn. 14.) To reverse a conviction due to ineffective assistance of counsel, a convicted defendant has the burden of proving (1) that counsel's performance was deficient due to errors so serious that counsel's performance fell below that which would be considered reasonable under prevailing professional norms; and (2) that the deficient performance prejudiced the defense due to errors so serious as to deprive the defendant of a fair trial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688.) When faced with the contention that a judgment should be reversed because counsel was ineffective, there is a strong presumption that counsel has "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (*Id.* at p. 690.)

19

To show ineffective assistance of counsel, the defendant must first prove that counsel's performance was unreasonable under prevailing professional standards and considering all the circumstances. (*Strickland v. Washington, supra,* 466 U.S. at p. 688.) The defendant "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." (*Id.* at p. 690.) Once counsel actions have been established to be unreasonable, the defendant next must show that counsel's assistance was prejudicial. To show sufficient prejudice, "the defendant must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.) Thus, prejudice is found where "there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." (*Id.* at p. 695.)

On appeal, this court must decide whether, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." (*Strickland v. Washington, supra,* 466 U.S. at p. 690.) In doing so, the court "should keep in mind that counsel's function is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (*Id.* at p. 690.)

Appellant states that the trial court failed to instruct the jury with CALCRIM No. 522 ("that provocation could negate premeditation"), and asserts that counsel's failure to request that instruction indicates ineffective assistance of counsel. Appellant does not claim the trial court had a duty to instruct on the issue of provocation, as CALCRIM No. 522 is a pinpoint instruction.[14] Instead, he claims that his counsel was ineffective for not requesting the instruction.

---

[14] Provocation is relevant "only to the extent it 'bears on the question' whether defendant premeditated or deliberated. Because [the instruction] relates the evidence of provocation to the specific legal issue of premeditation and deliberation, it is a 'pinpoint

20

CALCRIM No. 522 states: "Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter]. The weight and significance of the provocation, if any, are for you to decide. If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. [Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.] [Provocation does not apply to a prosecution under a theory of felony murder.]" (CALCRIM, Judicial Council of California Criminal Jury Instruction 522.)

## A.     Competence

"Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable assistance.' [Citation.] '[W]e accord great deference to counsel's tactical decisions' [citation], and we have explained that 'courts should not second guess reasonable, if difficult, tactical decisions in the harsh light of hindsight.' [Citation.] 'Tactical errors are generally not deemed reversible, and counsel's decision making must be evaluated in the context of available facts.'" (*People v. Weaver* (2001) 26 Cal.4th 876, 925-926.) "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." (*Strickland*, *supra*, 466 U.S. at pp. 688-689.)

"Competent counsel is not required to make all conceivable motions or to leave an exhaustive paper trail for the sake of the record. Rather, competent counsel should realistically examine the case, the evidence, and the issues, and pursue those avenues of

instruction' and need not be given on the court's own motion." (*Rogers*, *supra*, 39 Cal.4th at pp. 878-879, citations omitted.)

21

defense that, to their best and reasonable professional judgment seem appropriate under the circumstances. [Citation.]" (*People v. Anzalone* (2006) 141 Cal.App.4th 380, 394.)

Here, the record does not indicate why trial counsel did not ask for pinpoint instruction on provocation. Counsel may have made a tactical choice to not do so because counsel was pursuing a theory of self-defense. We cannot say, as a matter of law, based on the record before us on appeal, that counsel displayed incompetence.

As the California Supreme Court has often noted, claims such as those made by Appellant are better suited to a petition for writ of habeas corpus than to an appeal:

> "[N]ormally a claim of ineffective assistance of counsel is appropriately raised in a petition for writ of habeas corpus (see, e.g., *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267), where relevant facts and circumstances not reflected in the record on appeal, such a counsel's reasons for pursuing or not pursuing a particular trial strategy, can be brought to light to inform the two-pronged inquiry of whether counsel's 'representation fell below an objective standard of reasonableness,' and whether 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' [Citation.]" (*People v. Snow* (2003) 30 Cal.4th 43, 111; see, e.g., *In re Cordero* (1988) 46 Cal.3d 161 [habeas corpus proceeding exploring whether defense counsel failed to conduct reasonable factual investigation of defendant's potential defense of intoxication]; *In re Avena* (1996) 12 Cal.4th 694 [habeas corpus proceeding exploring whether defense counsel should have investigated and presented defense based on defendant's drug intoxication during crimes and whether he should have challenged admission of taped confession].) The Supreme Court made clear in *Mendoza Tello*, that an appellate court should not "set aside a jury verdict, and brand a defense attorney incompetent unless it can be truly confident all the relevant facts have been developed. . . ." (*People v. Mendoza Tello, supra,* 15 Cal.4th at p. 267.)

Here, we cannot determine the merits of appellant's assertions against defense counsel.

### B.	Prejudice

In any event, appellant has not shown the requisite prejudice.  To establish the requisite prejudice, the defendant must show that but for his counsel's error, the outcome would have been different; to assess the prejudicial value, the appellate court must "reweigh the evidence in aggravation against the totality of available mitigating evidence."  (*Wiggins v. Smith* (2003) 539 U.S. 510, 534.)

Here, evaluating the evidence before the trial court and highlighting any possible mitigating evidence would not alter the result of the trial.  The only evidence appellant provided to support his alternate theory based on provocation was that he "snapped" in reaction to Victim's actions on the night of the killing.  This, however, contradicts other testimony as to his ready-to-respond state of mind and his own assertion that he acted out of fear for the safety of himself and others.  Additionally, appellant's quick action does not necessarily mean he was provoked.  Nothing in the record shows, nor does appellant point to any evidence, that he was personally confronted.  Instead, when appellant saw Victim in an argument with his friends, appellant walked toward Victim and shot him at close range.  Even if his counsel had requested an instruction on provocation and the instruction been given, we are not convinced there is a reasonable probability that the result of the proceeding would have been different.

### IV.	The Parole Revocation Fine

Under section 1202.45, for a person convicted of a crime and whose sentence includes parole time, "the court shall at the time of imposing the restitution fine pursuant to subdivision (b) of section 1202.4, assess an additional parole revocation restitution fine in the same amount."  (§ 1202.45.)  However, this parole revocation restitution fine "shall be suspended unless the person's parole is revoked."  (*Ibid*.)

Here, both parties agree that pursuant to section 1202.45, it was appropriate for the court to suspend the parole revocation fine.  While the abstract of judgment and the minute order properly reflect the suspension of the fine, the trial court apparently misspoke in failing to state that the fine was suspended when it orally pronounced the sentence.   As a result, an inconsistency appears between the oral pronouncement and the

23

abstract of judgment. However, the abstract of judgment reflects the proper sentence and controls in this instance. As a result, remand is unwarranted in this case.

## *DISPOSITION*

The judgment is affirmed.

**WOODS, Acting P. J.**

**We concur:**

**ZELON, J.**

**JACKSON, J.**

24