Filed 9/10/25  P. v. Pontarelli CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GAGE HAROLD PONTARELLI,<br><br>    Defendant and Appellant. | A170915<br><br>(Solano County<br>Super. Ct. No. FCR339277) |

Defendant Gage Harold Pontarelli appeals from a judgment of conviction after a jury found him guilty of first degree murder (Pen. Code,[1] § 187, subd. (a)) and found true the allegation that he personally and intentionally discharged a firearm (§ 12022.53, subd. (d)).  The trial court sentenced him to 25 years to life.  On appeal, Pontarelli challenges the denial of his motion for new trial, claiming that his trial counsel rendered ineffective assistance by failing to investigate and raise a mental health defense in mitigation of his crime.  We affirm.

## I.  BACKGROUND

Pontarelli was charged by amended information with murder in connection with the death of his girlfriend, Samantha J.  (§§ 187, subd. (a), 12022.53, subd. (d).)  The amended information alleged that he personally

_____

[1] Undesignated statutory references are to the Penal Code.

1

used a firearm, that he personally and intentionally discharged a firearm, and that he caused great bodily injury and death to Samantha by personally and intentionally discharging a firearm. (§ 12022.53, subds. (b)–(d).)

At trial, the jury was instructed on the lesser included offenses of voluntary and involuntary manslaughter. Pontarelli's trial counsel, Jessica Agnich, focused the defense on the theory that Pontarelli picked up a gun in response to Samantha attacking him but did not intentionally shoot her; rather, the gun discharged accidentally.

## A. The Prosecution's Case

At approximately 3:00 a.m. on July 22, 2018, Pontarelli and Samantha were arguing in Pontarelli's garage. The argument woke up Pontarelli's neighbors, one of whom testified that he heard Samantha say something like, "Are you going to shoot me?" The neighbors then heard a gunshot, followed by Pontarelli screaming, "Oh, no, oh, God, oh, God, oh, no." The neighbors called 911, and one of them rushed to Pontarelli's garage, where he found Samantha "slumped against a couch" with "a great deal of blood."

As the neighbor performed cardiopulmonary resuscitation on Samantha, he noticed a handgun lying on a chair about arm's reach from the couch.

Samantha was dead by the time paramedics arrived. Pontarelli was "distraught" and crying. He had "a pink oval-shaped mark" on the inside of his left arm and a small pink mark on his right hand.

Police officers searched Pontarelli's garage and discovered three loaded firearms, including a semiautomatic pistol, a duffel bag containing a bottle of clonazepam that was prescribed to Pontarelli, an owner's manual for the pistol, two live rounds, and a "spent casing."

2

The neighbor's Nest camera captured audio of Pontarelli and Samantha's argument.[2]  Pontarelli could be heard saying, "You're standing on my car now, bitch."  At some point, Samantha asked him if he was going to pull the trigger.  Pontarelli then says either, "And that's why I'm a real gangster" or "And that's why you're still dangerous."

The forensic pathologist who conducted Samantha's autopsy found that she had several bruises on her body and face.  They appeared to be recent but could have been inflicted hours or even a day before her death.  There was a bullet wound to the left side of her chest but no visible gunpowder stippling around the entry wound, which would have indicated that she was shot within a three-foot distance.

A firearms expert reviewed the Nest audio and testified that he heard the "distinct sound . . . of a gun being racked," meaning someone was pulling the gun's slide back to insert a round into the firing chamber.  He demonstrated for the jury the racking of the gun.

A video on Pontarelli's phone showed him with a semiautomatic pistol, which the expert believed was the same make and model as the gun used to kill Samantha.  After reviewing the video, the expert opined that Pontarelli knew how to operate the firearm.  The expert further opined that it would take at least some force to fire the gun; Pontarelli could not "just brush" against the trigger.  The gun appeared to be functioning properly.

---

[2] It does not appear from the record that the parties identified the Nest audio exhibits in their notices of designation of the record.  (See Cal. Rules of Court, rule 8.122(a)(3).)  Thus, our discussion of the Nest audio is limited to the portions of the trial transcript cited by the parties that refer to the content of the audio.

## B. The Defense's Case

Pontarelli testified that on the night of the shooting, when him and Samantha were arguing in his garage, she started hitting herself and threatened to call the police on Pontarelli. Pontarelli grabbed Samantha's shirt and attempted to hug her, but she hit him in the face. As she physically assaulted him, Pontarelli asked her to leave.

The fight continued, and Pontarelli picked up his gun in fear that Samantha would use it against him or against herself. He held the gun with both hands and pointed it toward the ground and away from Samantha. He kept asking her to leave, but she kept attacking him. At some point, he pulled her to the couch. She hit him with her purse, threw a glass bong at him, and then bit his arm. The bite caused Pontarelli to flinch, and the gun went off.

Pontarelli denied intentionally shooting Samantha or threatening her with the gun. He testified that his finger "must have slipped" because he did not have his finger on the trigger prior to flinching, and he did not pull the trigger on purpose. He also denied racking the gun. He kept the gun loaded for "personal safety." He further denied saying anything "about being a gangster."

DNA samples collected from the oval-shaped mark on Pontarelli's arm matched Samantha's DNA profile. The results were inconclusive as to whether the DNA came from saliva.

A firearms expert opined that the evidence was consistent with Pontarelli's version of events. He explained that he found gunshot residue on Samantha's clothing, which indicated that she was within three feet from Pontarelli when the gun fired. The expert believed that the large amount of blood on Samantha's clothing may have obscured the gunshot residue during

4

her autopsy. He also pointed out that the trajectory of the bullet upon entering Samantha indicated that the gun was pointing down at her or that she had lunged forward. He further noted that a scientific study showed "a high likelihood of an unintentional discharge of a firearm" where individuals are struggling over the firearm, even if nobody has their finger on the trigger. All this evidence combined, coupled with the fact that Pontarelli's gun had no safety, demonstrated that the likelihood of an unintentional discharge was high in the situation described by Pontarelli.

According to Pontarelli, Samantha had threatened to hurt or kill herself on previous occasions. She had also been violent toward Pontarelli in the past, with Pontarelli estimating that she had hit him over 30 times prior to that night. Pontarelli never hit her back and would instead talk to her or hold her until she stopped hitting him.

Two friends of the couple recounted instances where they witnessed Samantha hit Pontarelli or threaten him with serious injury or death. Pontarelli never retaliated with violence or threats. Samantha's sister testified regarding multiple occasions where Samantha threatened to kill her and their mother.

## C. The Motion for a New Trial

After he was convicted of first degree murder, Pontarelli retained a different lawyer in place of Agnich. New counsel filed a motion for new trial, alleging in relevant part that Agnich rendered ineffective assistance of counsel by failing to investigate any mental health defenses. Accompanying the motion were the declaration of Pontarelli, a report from a forensic psychiatrist, Dr. Omri Berger, and a "Preliminary Opinion Letter" from a legal expert on effective assistance of counsel, John T. Philipsborn.

5

Based on his review of the evidence and Pontarelli's medical records, Dr. Berger stated in his report that Pontarelli was likely suffering from anxiety, depression, and a trauma-related disorder at the time of the shooting. Dr. Berger opined that Pontarelli was likely "triggered" by the physical and verbal confrontation with Samantha. As a result, he was likely experiencing a "heightened emotional state" during the incident that likely involved fear and anger, and he was susceptible to reacting to Samantha's physical assault "in an exaggerated and impulsive manner." Dr. Berger concluded that Pontarelli's trauma-related disorder potentially caused Pontarelli to shoot Samantha "in an impulsive and/or accidental manner."

In its response to Pontarelli's motion, the prosecution argued that Agnich did not render ineffective assistance of counsel by focusing on a defense theory that the shooting was an accident. Dr. Berger's opinions regarding how Pontarelli may have reacted to Samantha's provocation were inconsistent with the "multiple statements" Pontarelli had made to police that the shooting was an accident.

Dr. Berger, Philipsborn, Agnich, and Pontarelli testified at the evidentiary hearing on the motion for new trial, as summarized below.

### 1. Dr. Berger's Testimony

Dr. Berger testified that, according to medical records, Pontarelli was diagnosed with post-traumatic stress disorder (PTSD) in 2014 and had been receiving treatment for PTSD at the time of the shooting. Dr. Berger explained that individuals with PTSD are more susceptible to being triggered into a "fight-flight" response and to feeling threatened. They tend to react in an "exaggerated or impulsive" manner "with little ability and time to consider one's actions to assess the situation." "[T]he person's behavior is much more driven by their emotional state than by a . . . deliberative and conscious

6

thought process." If the person's "triggered state" involves anger and agitation, that person "is more likely to react violently and impulsively to a perceived threat." He said it was not uncommon for individuals with PTSD to overestimate the degree of danger before them.

Dr. Berger concluded that during the incident, Pontarelli was experiencing a "heightened emotional state" that made him susceptible to reacting in an impulsive manner. This conclusion was supported by Pontarelli's behavior immediately after the shooting, as captured by the Nest camera and the 911 call, which indicated that he was highly distressed. Dr. Berger further concluded that Pontarelli's claim that the gun fired accidentally was consistent with the type of "reflexive or instinctual response" that can happen with individuals experiencing a heightened emotional state.

Dr. Berger acknowledged that he did not personally evaluate Pontarelli or speak with any of his doctors. He said an evaluation of Pontarelli would help identify Pontarelli's "thought process" and the "specific emotions" he was experiencing during the incident and could clarify whether he believed he needed a gun to defend himself against Samantha. In making his opinions, Dr. Berger did not consider whether Pontarelli "mistook" the danger that was presented.

### 2. Agnich's Testimony

Agnich testified that she was aware that Pontarelli may have had depression, anxiety, and PTSD and admitted that she did not obtain Pontarelli's medical records or consult with a forensic mental health consultant. She reasoned that a mental health defense would have been inconsistent with a theory that the shooting was an accident, and the latter theory "was the better defense" based on the evidence and Pontarelli's prior

7

statements.  Pontarelli had "made a statement for hours to the police, as well as to the 911 operator," that the shooting was an accident.  The accident theory was also supported by the physical evidence, as demonstrated by the defense expert's testimony.  Agnich said, "Presenting something inconsistent with my argument . . . would have basically taken away from my credibility with the jury," and Pontarelli would have been impeached with his prior statements.

Agnich said she talked at length with Pontarelli about a potential mental health defense, but he never indicated that his mental health played a role in the shooting or that he shot Samantha because he perceived her as a threat.  She was concerned that if she pursued a mental health defense, the prosecution could have its own expert interview appellant, creating "a trial within a trial that was not relevant in this case."  It was also noted that Pontarelli's PTSD may have been caused or exacerbated by him being robbed at gunpoint when he was dealing drugs.  Agnich said it was important to exclude evidence of Pontarelli's drug dealing because it could affect the jury's perception of him.

### 3. Philipsborn's Testimony

Philipsborn testified that Agnich had a duty to investigate based on her awareness of Pontarelli's mental health conditions, and she could not reject a mental health defense absent an adequate investigation.  He said that the expert evidence supporting an accident theory was not particularly strong and therefore did not obviate Agnich's duty to explore other possible defenses.

On cross-examination, Philipsborn agreed with the prosecution that a theory of voluntary manslaughter was contrary to Pontarelli's trial testimony and his prior statements to the police.  He further agreed that Agnich could have concluded, based on her familiarity with Pontarelli and her knowledge

8

of the facts of the case, that pursuing a mental health defense would not be an effective defense. He also agreed that it made sense to try to exclude evidence of Pontarelli's drug dealing, as it could have made him less sympathetic to the jury.

### 4. *Pontarelli's Testimony*

Pontarelli testified that he told Agnich early in the case that he had PTSD. In considering whether to present a mental health defense, he deferred to Agnich's expertise and did not insist on a particular defense.

### 5. *Trial Court's Ruling*

After hearing argument from the parties, the trial court denied Pontarelli's new trial motion. The court concluded that Agnich made a reasonable tactical choice to focus on one defense, and it "made a certain amount of sense" that she would select the defense that was consistent with Pontarelli's "many statements" that the shooting was an accident. The court therefore concluded that Agnich did not provide ineffective assistance of counsel.

## II. DISCUSSION

Pontarelli contends that, notwithstanding the trial court's denial of his motion for a new trial, he received ineffective assistance of counsel because Agnich failed to investigate his history of PTSD and consult with a forensic psychiatrist, thereby depriving him of a viable defense of imperfect self-defense.

"Imperfect self-defense is the actual, but unreasonable, belief in the need to resort to self-defense to protect oneself from imminent peril." (*People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1178.) It implies the intentional use of deadly force. (*People v. Curtis* (1994) 30 Cal.App.4th 1337, 1359.) Where the defense applies, it negates malice aforethought and

9

reduces a homicide from murder to voluntary manslaughter. (*Id.* at pp. 1354–1355.)

### A. The Law

Ineffective assistance of counsel may be raised in a motion for a new trial, even though it is not one of the statutorily enumerated grounds. (*People v. Fosselman* (1983) 33 Cal.3d 572, 582.) "Defendant bears the burden of proving ineffective assistance of counsel." (*People v. Jackson* (1989) 49 Cal.3d 1170, 1188.) Under *Strickland v. Washington* (1984) 466 U.S. 668 (*Strickland*), "a defendant must demonstrate that (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's representation subjected the defendant to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant." (*People v. Samayoa* (1997) 15 Cal.4th 795, 845.)

Where, as here, a nonstatutory new trial motion is grounded in a constitutional claim of ineffective assistance of counsel, a two-step standard of review applies. The first step requires the reviewing court to uphold the trial court's factual findings if substantial evidence supports the findings. (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724.) In the second step, the reviewing court exercises its independent judgment on the legal issues: whether counsel's performance was deficient and whether the defendant was prejudiced as a result. (*Id.* at pp. 724–725.)

We review the trial court's ruling, not its reasoning, and may uphold it on any basis presented by the record. (See *People v. Camacho* (2022) 14 Cal.5th 77, 123 ["we review the trial court's ruling, 'not the court's reasoning and, if the ruling was correct on any ground, we affirm' "]; *People v. Zapien* (1993) 4 Cal.4th 929, 976, superseded on other grounds by § 190.41.)

## B. Reasonableness of Counsel's Performance

Pontarelli challenges Agnich's decision to focus the defense on the theory that the shooting was an accident. He argues that Agnich could not have made an informed decision to forego a defense of imperfect self-defense in favor of an accidental shooting theory absent examination of his mental health records or an expert evaluation, and thus Agnich's performance was objectively unreasonable. We conclude that Agnich made a sufficiently informed tactical decision to pursue a theory that the shooting was an accident.

Agnich was not required to exhaustively investigate every potential defense. " '[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.' " (*In re Andrews* (2002) 28 Cal.4th 1234, 1254, quoting *Strickland, supra,* 466 U.S. at pp. 690–691.)

The reasonableness of Agnich's decision to limit her investigation is assessed according to the information available to her and her chosen defense strategy. (*In re Thomas* (2006) 37 Cal.4th 1249, 1264; see *Turk v. White* (9th Cir. 1997) 116 F.3d 1264, 1266–1267 [counsel's failure to investigate an insanity defense was not ineffective assistance where he investigated a defense of self-defense, discovered evidence supporting that defense, and chose to not pursue an insanity defense that would have conflicted with the self-defense theory].)

In this case, Agnich had a client who had repeatedly made statements to the police that the shooting was an accident.[3] Pontarelli said he had picked up the gun because he was scared Samantha would use it against him or against herself. He claimed that he pointed the gun at the ground, never at Samantha, and he did not "rack" the gun. He denied pulling the trigger on purpose and insisted that the gun accidentally went off when Samantha bit him and he flinched.

Neither the physical evidence nor the audio recording of the shooting conclusively refuted Pontarelli's version of events. To the contrary, Agnich had a firearms expert who could explain that the physical evidence presented a "high likelihood of an unintentional discharge of a firearm" in the situation described by Pontarelli. Moreover, in addition to his repeated denials that the shooting was intentional, Pontarelli never indicated that he perceived Samantha as a threat at the time of the shooting, despite discussing a potential defense of self-defense with Agnich. Thus, the information known to Agnich supported a reasonable tactical decision to focus the defense on the theory of an accidental shooting. (See *Strickland, supra,* 466 U.S. at p. 691; *In re Cordero* (1988) 46 Cal.3d 161, 182 ["a client's comments certainly bear on the appropriate scope and focus of counsel's factual investigation"].)

On the other hand, a defense of imperfect self-defense would have faced significant challenges. The defense would be difficult to establish absent testimony from the defendant that he or she "actually believed" there was an immediate threat of great bodily harm or death and intentionally used deadly force to defend against the danger. (CALCRIM No. 571; see *People v. Elmore* (2014) 59 Cal.4th 121, 129–130, superseded on other grounds by § 188, subd.

---

[3] Neither party has pointed us to the statements Pontarelli made to police, but presumably they are similar in substance to his trial testimony.

(a)(3); *People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 745.) If the defendant has a mental health condition, an expert may offer an opinion in response to hypothetical questions on how a person with the defendant's mental health condition may perceive the situation, but the expert cannot say whether the defendant in fact had an actual belief in the need for self-defense. (§ 29; *People v. Humphrey* (1996) 13 Cal.4th 1073, 1085 [expert testimony relevant to show how the defendant's experiences affected her perception of danger and its imminence].)

In this case, even assuming evidence was presented regarding Pontarelli's mental health conditions, Pontarelli's version of events, as told to the police, would likely negate any inference that he had, in fact, intentionally shot Samantha because he believed she posed an imminent threat of serious harm to him. This is not a situation where Pontarelli could not recall the events immediately prior to the shooting, thereby leaving room in his narrative for the possibility that he shot Samantha in self-defense. Rather, Pontarelli stated unequivocally that the gun went off because of his reflexive reaction to Samantha biting him, which had "surprised" him. Had Pontarelli testified at trial as to a different version of events, the prosecution could have impeached him with his prior statements.

Further, Agnich recognized that a mental health defense could open the door to damaging evidence of Pontarelli's drug dealing, as she had information indicating that Pontarelli's involvement in a "drug deal gone bad" may have contributed to his PTSD.

Applying the *Strickland* standard, we cannot conclude that Agnich's failure to further investigate a defense of imperfect self-defense was constitutionally deficient. When Agnich made her decision, she had information that Pontarelli suffered from depression, anxiety, and PTSD at

13

the time of the shooting, but she also knew that Pontarelli had repeatedly denied intentionally shooting Samantha. It was reasonable for Agnich to concentrate on the theory that was consistent with Pontarelli's prior statements and that had evidentiary support "rather than potentially confusing the issues and detracting from [her] credibility with the jury by making a nonpersuasive argument." (*People v. Palmer* (2005) 133 Cal.App.4th 1141, 1159; see *People v. Jones* (1991) 53 Cal.3d 1115, 1138 ["The presentation of conflicting defenses is often tactically unwise because it tends to weaken counsel's credibility with the jury."]; *People v. Cunningham* (2001) 25 Cal.4th 926, 1007 ["counsel does not render ineffective assistance by choosing one or several theories of defense over another"]; *People v. Wickersham* (1982) 32 Cal.3d 307, 329 [concluding that the theory of unreasonable self-defense was inconsistent with the defendant's claim that the shooting was an accident], overruled on another point in *People v. Barton* (1995) 12 Cal.4th 186, 201.)

This case thus falls within the principle that "valid strategic choices are possible even without extensive investigative efforts." (*In re Andrews*, *supra*, 28 Cal.4th at p. 1254.) This distinguishes the cases upon which Pontarelli relies. (See, e.g., *People v. Ledesma* (1987) 43 Cal.3d 171, 196, 222–223 [counsel's performance was deficient where he chose to not investigate a diminished capacity defense based on a competency evaluation and the defendant's alleged confession, both of which said "little if anything about defendant's state of mind at the time of the killing"]; *In re Long* (2020) 10 Cal.5th 764, 777 [counsel's decision to focus on a third party culpability defense without investigating the victim's time of death was constitutionally deficient; "the two lines of defense were potentially complementary, not mutually exclusive"]; *In re Saunders* (1970) 2 Cal.3d 1033, 1049 [counsel's

failure to investigate was unreasonable where "a defense based upon petitioner's mental condition was in no way inconsistent with the defense offered by counsel"], modified on another ground by *People v. Duvall* (1995) 9 Cal.4th 464, 479–486 & fn. 8.) Therefore, Pontarelli has not demonstrated that Agnich's performance was deficient.

Pontarelli clarified at oral argument that he intended to argue that Agnich's failure to investigate his mental health deprived him of a defense of imperfect self-dense *and* of evidence that would have likely defeated the prosecution's theory of premeditation. While his appellate briefing and the headings contained therein focused on the theory of imperfect self-defense, we will address his latter argument since he briefly raised the issue in his opening brief. Pontarelli argued that Dr. Berger's opinions show that Pontarelli's PTSD likely caused him to act impulsively rather than with premeditation. Pontarelli claimed that a theory that he acted impulsively in shooting Samantha was not mutually exclusive with an accident theory, because his characterization of the shooting as an accident was referring to the fact that he did not mean to shoot Samantha, as opposed to the shooting being a "physical[]" accident. For those reasons, he concluded that Agnich's failure to investigate his mental health was unreasonable. However, his portrayal of the shooting as an impulsive act is inconsistent with his testimony and his prior statements to the police, as discussed above. Thus, Pontarelli's argument regarding premeditation does not change our conclusion that Agnich's tactical decision to focus on the theory that was consistent with Pontarelli's version of events and the physical evidence and

15

that would avoid the potential admission of damaging evidence was reasonable.[4]

### C. Prejudice

Even if Agnich's failure to investigate a defense of imperfect self-defense constituted ineffective assistance of counsel, Pontarelli has not shown any resulting prejudice.  To establish prejudice, a defendant must show that "it is reasonably probable that a determination more favorable to defendant would have resulted in the absence of counsel's failings." (*People v. Phillips* (1985) 41 Cal.3d 29, 60.)  " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*People v. Ledesma*, *supra*, 43 Cal.3d at p. 218, quoting *Strickland*, *supra*, 466 U.S. at pp. 693–694.)  Stated another way, " '[w]hen a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have a reasonable doubt respecting guilt.' " (*Ibid.*)

Here, even if Agnich had investigated and presented a defense of imperfect self-defense based on Pontarelli's PTSD, Pontarelli's version of events would likely negate an inference that he shot Samantha in self-defense, as discussed above.  Pontarelli's testimony also tends to establish that Samantha did not present an imminent threat of serious injury or death at the time of the shooting.  (See *People v. Humphrey*, *supra*, 13 Cal.4th at p. 1082 [for imperfect self-defense, "[t]he defendant's fear must be of *imminent* danger to life or great bodily injury"].)  Pontarelli was more than twice Samantha's size.  There was no evidence that immediately prior to the

---

[4] By separate order, we deny Pontarelli's petition for a writ of habeas corpus premised on the same alleged ineffective assistance of counsel. (*In re Gage Harold Pontarelli* (A174226).)

16

gun going off, Samantha had a weapon or had attempted to take the gun from Pontarelli.

While imperfect self-defense only requires that the defendant actually believe in the need for self-defense, and that perception can be affected by the mental state of the defendant, there is no evidence here that Pontarelli actually believed that Samantha posed an imminent threat of great bodily injury or death. Dr. Berger's opinions focused on how Pontarelli would likely react but did not explain what Pontarelli was thinking when he reacted. The doctor testified that by virtue of PTSD, Pontarelli was probably in a heightened emotional state during the incident and would likely react impulsively and without thinking, and he was more likely to react violently to a "perceived threat." Dr. Berger said Pontarelli's behavior after the shooting was "consistent with . . . an impulsive or accidental act." These characteristics do not indicate whether Pontarelli actually believed at the time of the shooting that he was threatened with immediate death or serious bodily injury. Although Dr. Berger stated that someone experiencing a "fight-flight" reaction was more susceptible to feeling threatened, he stopped short of offering an opinion indicating that someone with Pontarelli's mental health issues would perceive Samantha as an imminent threat of serious injury or death. Indeed, he agreed with the prosecution that his opinions were "preliminary" and that an evaluation of Pontarelli could help identify Pontarelli's thought process during the incident.

"In demonstrating prejudice, the appellant 'must carry his burden of proving prejudice as a "demonstrable reality," not simply speculation as to the effect of the errors or omissions of counsel.' " (*People v. Montoya* (2007) 149 Cal.App.4th 1139, 1147, quoting *People v. Williams* (1988) 44 Cal.3d 883, 937.) On this record, there is no reasonable probability that Pontarelli would

have achieved a more favorable result had Agnich investigated his mental health and presented a defense of imperfect self-defense.

### III.   DISPOSITION

The judgment is affirmed.

_____
Langhorne Wilson, J.

WE CONCUR:


_____
Humes, P. J.


_____
Smiley, J.


A170915/*People v. Pontarelli*